John J. MURRAY, James N. Berardi, Robert A. Petitti and Joseph M. Hurley, individually and on behalf of all others similarly situated, Plaintiffs,

v.

Cory J. MINER, Paul I. Brown and MMAR Group, Inc., Defendants.

No. 93 Civ. 2895 (RPP).

United States District Court, S.D. New York.

Feb. 1, 1995.

Winthrop, Stimson, Putnam & Roberts by Daniel Lowenthal, New York City, for plaintiffs.

Lambos & Giardino by Donato Caruso, New York City, for defendants.

**OPINION AND ORDER**

ROBERT P. PATTERSON, Jr., District Judge.

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, MMAR Group, Inc. and its principal shareholders, Cory Miner and Paul Brown (collectively, "the MMAR Defendants"), move to dismiss a diversity suit brought on April 30, 1993 by John Murray, James Berardi, Robert Petitti, and Joseph Hurley. The complaint seeks to hold the MMAR Defendants liable, under the single employer doctrine, for the contractual obligations of (1) Gnubrokers Holding, Inc. ("GHI") and its three subsidiaries, Gnubrokers of Governments, Inc., Gnubrokers Management, Inc., and Gnubrokers of Corporates, Inc. (collectively, "Gnubrokers Companies"), and (2) GHI's predecessor in interest, Fundamental Brokers, Inc. ("FBI"). On September 15, 1993, plaintiffs moved for class certification, citing common questions of law and fact with 56 other litigants. On June 15, 1994, plaintiffs moved to amend their complaint to add claims of piercing the corporate veil between the MMAR Defendants and the Gnubrokers Companies. Defendants now move to dismiss the complaint for failure to state a claim upon which relief can be granted, and oppose plaintiffs' motion to amend the complaint. For the reasons that follow, defendants' motion to dismiss the complaint is granted, and plaintiffs' motion to amend the complaint is denied. Although no ruling on the class certification issue is made at this time, the determinations made herein are dispositive of that motion.

**THE COMPLAINT**

According to the complaint, in July 1989 and January 1990, plaintiffs, who are all citizens of New Jersey and former government bond brokers employed by FBI, brought two related suits against FBI in the Southern District of New York ("the *Berardi* actions"), alleging that FBI breached its contract as to two-year compensation guarantees and bonus awards in 1987–88 and 1988–89.[1] In October

---

1. The complaint mentions seven related actions by other employees: four involve similar compensation claims, two are retaliatory employer conduct claims, and one is a sex and pregnancy discrimination claim. Although relevant to plaintiffs' motion for class certification, these actions do not bear on the disposition of the motions currently before the court.

1990, MMAR, a Texas securities broker, learned that FBI was for sale. MMAR had notice of FBI's liability exposure for breach of contracts related to compensation guarantees and bonus awards. In order to shield MMAR and themselves from such liability, Brown and Miner formed a separate corporation, GHI, for the purpose of acquiring FBI's assets; Brown and Miner each held 38.5% of GHI's shares. In February 1991, GHI and FBI entered an asset purchase agreement, transferring FBI's assets to GHI. In this agreement, the complaint alleges, GHI expressly assumed FBI's liabilities for many compensation claims of employees, including any liabilities arising from the *Berardi* actions.[2]

After the asset sale was consummated in February 1991, GHI continued to operate FBI's brokerage business out of the same offices as before, and used FBI letterhead in its communications; telephones were answered with the name of "FBI" or "Fundamental." In turn, the MMAR Defendants were intimately involved in the operation of both FBI and the Gnubrokers Companies. For example, MMAR held itself out to the FBI employees and the press as FBI's new owners; MMAR paid Brown and Miner's salaries as directors of GHI; MMAR charged various of its own expenses to the Gnubrokers Companies, or used Gnubrokers facilities without reimbursement; and the MMAR Defendants controlled various employment and litigation decisions relating to FBI employees.

In July 1992, in the *Berardi* actions, Judge Martin of this District entered judgments against FBI and in favor plaintiffs totalling roughly $1 million. These judgments remain unsatisfied.

Involuntary Chapter 7 bankruptcy proceedings were filed against FBI and GHI in the Southern District in August 1992. In October 1992, the three Gnubrokers subsidiaries filed voluntary Chapter 7 petitions in the Northern District of Georgia; these proceedings subsequently were transferred to the Southern District. Plaintiffs filed proofs of claims in the bankruptcy proceedings, as did many other FBI employees who had employment-related claims. During the pendency of that proceeding, the instant complaint was filed.

## DISCUSSION

### A. Defendants' Motion to Dismiss

A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). When passing on a motion to dismiss, the court must accept the allegations in the complaint as true and construe them in favor of the pleader. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972).

■ Both the individual and class action claims for relief in the complaint state as grounds for relief that "the MMAR Defendants so dominated the day-to-day operations of the Gnubrokers Companies, which assumed FBI's liabilities to plaintiffs ... as to render the MMAR Defendants liable to plaintiffs under the single employer doctrine." Under that doctrine, two entities may be regarded as a single employer, and therefore subject to joint liability for the acts of the entity that is plaintiffs' immediate employer, if they have (1) interrelated operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership. *Perry v. Manocherian,* 675 F.Supp. 1417, 1425 (S.D.N.Y.1987); *accord, Armbruster v. Quinn,* 711 F.2d 1332, 1337 (6th Cir.1983).

---

**2.** Plaintiffs did not submit a copy of the asset purchase agreement with their complaint. However, an opinion in a related action, *Locovare v. Fundamental Brokers, Inc.,* 126 Lab.Cas. (CCH) ¶ 57,566, 1992 WL 162646 (S.D.N.Y.1992), states that according to the terms of this agreement, FBI agreed to remain liable for "any liabilities or obligations relating to any former, present or future employees, whether part-time or full time, of any of the Sellers." Such contractual language appears directly to contradict plaintiffs' assertion in their complaint of an express assumption of liability by GHI for the compensation in question.

Plaintiffs argue that because GHI assumed liability for FBI's obligations to plaintiffs, the MMAR Defendants must share this liability as single employers with GHI. This argument, however, misapprehends the nature of the single employer doctrine.

As plaintiffs concede, the doctrine applies to claims that fundamentally implicate employer-employee relationships. *See, e.g., Armbruster*, 711 F.2d at 1338 (applying doctrine to Title VII claims); *Carpenters Local Union No. 1846 of the United Brotherhood of Carpenters & Joiners of America v. Pratt–Farnsworth, Inc.*, 690 F.2d 489, 507 (5th Cir. Unit B 1982), *cert. denied*, 464 U.S. 932, 104 S.Ct. 335, 78 L.Ed.2d 305 (1983) (applying doctrine to NLRA claims). In such contexts, the doctrine enables a wronged employee to impose liability on an entity that, although not his employer of record, exercises sufficient control over employment decisions to bear responsibility for the wrong in question. In order for the doctrine to apply, therefore, the two entities must share control at the time of the alleged wrong. *See, e.g., Parliament House Motor Hotel v. EEOC*, 444 F.2d 1335, 1340–41 (5th Cir.1971) (allowing discovery against former corporate owner of hotel where "the two may well have constituted a single employer at the time the alleged act of discrimination occurred") (emphasis added); *EEOC v. McLemore Food Stores, Inc.*, 25 Fair Employment Practice Cases (BNA) 1356, 1359–60, 1978 WL 13922 (W.D.Tenn. 1977) (dispositive issue is relation among entities at time of alleged discriminatory act).

Here, the wrongs alleged in the complaint all occurred between 1987 and 1989, long before GHI's acquisition of FBI in February 1991. Accepting the complaint's allegations as true, the alleged wrongs all occurred at a time when GHI itself had no employment relationship with plaintiffs as employees, or any responsibility for FBI's acts as employer. A fortiori, the MMAR Defendants had no employment relationship with plaintiffs at the time of the alleged wrong. Plaintiffs' allegations therefore lack the necessary prerequisite for imposing liability on the MMAR Defendants under the single employer doctrine.

In sum, the complaint alleges that GHI's liability to plaintiffs rests solely on its alleged contractual assumption of FBI's obligations.[3] The complaint does not allege any employer-employee relationship between either GHI or the MMAR Defendants and plaintiffs that gave rise to the alleged wrong. Hence the complaint provides no basis for holding the MMAR defendants jointly liable with GHI as a "single employer" of plaintiffs.[4] Therefore, the complaint must be dismissed.

## B. Plaintiffs' Motion to Amend the Complaint

Plaintiffs' third and fourth causes of action added in their proposed amended complaint are predicated on their standing to pierce the corporate veil between GHI and its controlling shareholders, the MMAR Defendants.[5]

---

**3.** Regardless of an asset purchasers' contractual obligations, courts may impose liability on an asset purchaser for the employment-related wrongs of its predecessors under the doctrine of "successor liability," which has been applied to labor law claims and employment discrimination claims. *See, e.g., Musikiwamba v. ESSI, Inc.*, 760 F.2d 740 (7th Cir.1985). Although not relevant to the present motion to dismiss, imposition of successor liability on GHI for the common law breach of contract claims at issue here appears inappropriate, for the reasons set forth in *Locovare*.

**4.** Thus, *Brower–Coad v. Fundamental Brokers, Inc.*, 856 F.Supp. 147, 149 (S.D.N.Y.1993), which held that the MMAR Defendants could be held liable for the discriminatory discharge of an FBI employee, is distinguishable. In that case, the plaintiff was discharged by GHI, after the asset sale took place.

**5.** In February 1993, at the trustee in bankruptcy's request, plaintiffs agreed to provide sixty days notice to the trustee before proceeding against the MMAR Defendants on any theory available to the Gnubrokers Companies' creditors generally, including veil-piercing claims; the trustee made this request in order to have adequate opportunity to determine whether to press veil piercing claims on behalf of the estate. Thereafter, when plaintiffs filed their April 30, 1993, complaint, they limited their basis for relief to the single employer doctrine. On March 2, 1994, upon receiving notice that the trustee and the MMAR Defendants proposed to enter a settlement agreement that would encompass the veil piercing and reach of fiduciary claims of the debtor corporations, plaintiffs notified the trustee of its intent to pursue its own veil-piercing claims; the trustee did not indicate any objection. On June 15, plaintiffs filed their amended complaint.

Plaintiffs' motion to amend must be denied if the proposed amendment "could not withstand a motion to dismiss." *Journal Publishing Co. v. American Home Assurance Co.*, 771 F.Supp. 632, 635 (S.D.N.Y.1991).

 The dispositive issue is whether plaintiffs have standing to raise an alter ego claim against the MMAR Defendants. Plaintiffs lack such standing if the claim belongs to the trustee in bankruptcy. *Kalb, Voorhis & Co. v. American Financial Corp.*, 8 F.3d 130, 132 (2d Cir.1993). The claim belongs to the trustee if (1) "under governing state law the debtor could have asserted an alter ego claim to pierce its own corporate veil," *id.*, and (2) plaintiffs' claim "is a general one," of the type that "could be brought by any creditor of the debtor," *St. Paul Fire & Marine Insurance Co. v. PepsiCo, Inc.*, 884 F.2d 688, 701 (2d Cir.1989). If the trustee can bring such a claim, plaintiffs "are bound by the outcome of the trustee's action." *Id.* This rule ensures that all of a debtor's creditors receive equal treatment: otherwise, those who asserted alter ego claims first "would obtain payment of the claims in preference to and to the detriment of other creditors," *id.* (citation omitted), despite having no greater claim on the alter ego's assets.

 The parties agree, applying the law of New York, that the law of Gnubrokers Companies' place of incorporation, Delaware, is the governing state law. *See Kalb, Voorhis & Co.*, 8 F.3d at 132. Although no cases have been found holding that a trustee of a debtor corporation in bankruptcy may bring such a claim, several cases make clear that under Delaware law, a subsidiary may maintain an action against its corporate parent or controlling shareholder. *See Sinclair Oil Corp. v. Levien*, 280 A.2d 717 (Del.1971); *Liebert v. Grinnell Corp.*, 194 A.2d 846 (Del. Ch.1963); *Marks v. Wolfson*, 188 A.2d 680 (Del.Ch.1963). Thus, the first test, the right of the debtor to sue its corporate parent or controlling shareholder, is met.

In *Sinclair*, a minority shareholder of a corporate subsidiary brought a derivative action against the parent corporation. The shareholder claimed that the parent corporation had acted to the detriment of the subsidiary by (1) causing the subsidiary to make an improper distribution of dividends, and (2) causing another party to breach various contracts with the subsidiary. The Delaware Supreme Court upheld the latter claim, demonstrating the right of the subsidiary to sue its parent for breach of fiduciary duties.

 Similarly, in *Liebert*, shareholders of the parent corporation brought a double derivative claim, on behalf of the subsidiary, against the parent corporation itself.[6] The shareholders requested the Chancellor's Court to compel the parent corporation "to cause [the subsidiary] to distribute to its stockholders ... all of its earned surplus in excess of an amount the Court determines is necessary to retain for the proper conduct of the business affairs [of the subsidiary]." *Liebert*, 194 A.2d at 847. Although the Chancellor concluded that the claim lacked merit, implicit in that conclusion is the determination that under Delaware law, the shareholders had the right, on behalf of the subsidiary, to assert the subsidiary's claim against the parent corporation.

Finally, in *Marks*, a minority shareholder, challenging a corporate subsidiary's sale of assets, alleged that a controlling shareholder of the parent company had conspired with the buyer to purchase the assets at an inadequate price to the seller. Although the shareholder's claim was dismissed on the merits, the court accepted the precept of the shareholder's right to assert such a claim on behalf of the subsidiary, against the controlling shareholder of the parent corporation.

 These cases indicate that under Delaware law, because of a corporate parent's fiduciary duties to a subsidiary, the subsid-

---

6. A double derivative action is a derivative action maintained by the shareholders of a parent corporation or holding company on behalf of a subsidiary. *Sternberg v. O'Neil*, 550 A.2d 1105, 1107 n. 1 (Del.1988). Delaware courts will allow a shareholder of the parent corporation company to maintain such an action even if he does not own any shares of the subsidiary, effectively breaching the corporate veil that separates the two. *Cf. Martin v. D.B. Martin Co.*, 88 A. 612 (Del.Ch.1913) (ruling that "the legal fiction of distinct corporate entities should be disregarded" so that shareholders of holding company could inspect subsidiaries' books).

iary may institute proceedings against the parent if it has sustained liability to third parties as a result of the parent's control. One can only conclude that for purposes of applying federal bankruptcy law, Delaware courts would permit a debtor corporation to "assert[ ] an alter ego claim to pierce its own corporate veil," *Kalb, Voorhis & Co.*, 8 F.3d at 132. Consequently, in the present action, the trustee has sole standing to raise all alter ego claims of a general nature asserted by the Gnubrokers Companies' creditors.

Since only the trustee may raise general alter ego claims, the claims in the amended complaint must fall outside this category to be properly asserted in this action. Plaintiffs aver no particularized injury flowing from MMAR's acts that are distinct from those suffered by other Gnubrokers Companies creditors. The amended complaint avers only that MMAR wasted the Gnubrokers Companies assets, and impaired GHI's ability to meet obligations the latter assumed in acquiring FBI. Such wrongful acts equally injure any other creditors of FBI and the Gnubrokers' Companies. Because plaintiffs' claims are general, therefore, they are bound by the outcome of the trustee's actions.

Under such circumstances, plaintiffs may assert a veil-piercing claim only if the claim has been abandoned by the trustee. *St. Paul*, 884 F.2d at 706. Plaintiffs make no allegation in their amended complaint that the trustee has abandoned the claim. To the contrary, the affidavit attached to plaintiffs' amended complaint represents that a settlement entered between the trustee and the MMAR Defendants incorporated the alter ego claims of the Gnubrokers Companies' creditors and that the settlement has been approved by the bankruptcy court.[7] Because plaintiffs' are bound by this settlement, their amended complaint could not survive a motion to dismiss.

## CONCLUSION

For the reasons set forth, the MMAR Defendants' motion to dismiss is hereby grant-

ed, and plaintiffs' motion to amend their complaint is hereby denied.

IT IS SO ORDERED.

---

7. In connection with their motion to amend the complaint, the MMAR Defendants submitted a copy of the proposed settlement that was presented to the bankruptcy court for approval. Under its terms, the trustee agreed to accept $750,000 in settlement of the general alter ego claims of Gnubrokers Companies' creditors. The document states that the settlement amount reflects, in part, the trustee's view of the difficulties of pursuing a successful alter ego claim.