**In the Matter of iPCS, INC., iPCS Wireless, Inc. iPCS Equipment, Inc., Debtors.**

**Nos. 03–62695–WHD, 03–62696– WHD, 03–62697–WHD.**

United States Bankruptcy Court, N.D. Georgia, Atlanta Division.

Aug. 19, 2003.

James C. Cifelli, Esq., Lamberth, Cifelli, Stokes & Stout, Atlanta, GA, for Debtors.

E. Penn Nicholson, Esq., Powell, Goldstein, Frazer & Murphy, Atlanta, GA, Andrew N. Rosenberg, Esq., Paul, Weiss, Rifkind, et al., New York City, for Official Committee of Unsecured Creditors.

Daniel J. King, Esq., James A. Pardo, Esq., King & Spalding, LLP, Atlanta, GA, for Sprint Spectrum, L.P.; Sprint Communications Company, L.P.; WirelessCo, L.P.; SprintCom, Inc.

### ORDER

W. HOMER DRAKE, Jr., Bankruptcy Judge.

Before the Court is the Application for Authorization to Commence and Prosecute Suit (hereinafter the "Application"), which was filed by the Official Committee of Unsecured Creditors of iPCS, Inc. (hereinafter the "Committee") in the above-captioned bankruptcy proceeding. The Application is opposed by Sprint Spectrum, L.P. (hereinafter "Spectrum"), Sprint Communications Company, L.P., WirelessCo L.P. (hereinafter "WirelessCo"), and Sprint-Com, Inc. (hereinafter "SprintCom").

#### BACKGROUND

On February 23, 2003, iPCS, Inc. (hereinafter "iPCS"), iPCS Wireless, Inc. (hereinafter "iPCS Wireless"), and iPCS Equipment, Inc. (collectively referred to hereinafter as the "Debtors"), all Delaware corporations, filed voluntary petitions under Chapter 11 of the Bankruptcy Code. To this date, the Debtors continue to operate their businesses as debtors-in-

possession. On March 13, 2003, the United States Trustee appointed the Committee.

Since 1999, the Debtors, through certain management and services agreements with WirelessCo, Spectrum, and SprintCom (hereinafter the "Sprint Companies"), has constructed, operated, managed, and maintained a wireless, personal communications network throughout the Midwest (hereinafter the "Network"). In accordance with these agreements, the Debtors have the exclusive right to provide personal telecommunications services to customers under the Sprint and Sprint PCS brand names in the area covered by the Network. In turn, the contractual relationship allows the Sprint Companies to utilize the Network in order to provide their customers with a nationwide cellular telephone network. Pursuant to the Management Agreement, the Debtors are entitled to 92% of the "Collected Revenue," as defined within the agreement. Under the Services Agreement, the Debtors agreed to pay the Sprint Companies to provide certain services to the Debtors, including billing, collection, and customer care services.

On February 23, 2003, iPCS and iPCS Wireless filed a complaint against the Sprint Companies and Sprint Corporation seeking equitable relief and damages. The Debtors allege that the Sprint Companies have breached the Management and Services Agreements by, among other things, failing to calculate the amount of the Collected Revenue in accordance with the terms of the Management Agreement and charging the Debtors various fees that are not authorized under the Agreements. In their complaint, the Debtors state that they have provided notice to the Sprint Companies of the Debtors' intent to terminate the Agreements in accordance with their terms and allege that the Sprint

Companies' conduct has resulted in an event of default, which entitles the Debtors to demand that the Sprint Companies purchase the Debtors' business for an amount to be determined in accordance with the terms of Agreements.

The Debtors seek a declaratory judgment that the Sprint Companies have defaulted under the terms of the Agreements and specific performance of the Agreements. The Debtors have also requested that the Court issue preliminary and permanent injunctions requiring the Sprint Companies to pay to the Debtors on a weekly basis their share of the revenue, without any deductions for fees or setoffs, and to provide a monthly accounting of the revenues generated by the Network. Additionally, the Debtors assert that, due to the intricate nature of the accounts and transactions between the parties, the Debtors are incapable of independently determining the true amounts owed by the Sprint Companies to the Debtors. Accordingly, the Debtors ask the Court to order the Sprint Companies to provide a comprehensive accounting of all transactions between the parties since 1999. The Debtors further assert that, due to the broad discretion provided to the Sprint Companies under the Agreements, the Sprint Companies owed the Debtors duties of good faith and fair dealing, as well as "heightened duties of care and good faith in the performance of [their] obligations and responsibilities under the agreements." The Debtors allege that the Sprint Companies breached these duties, causing severe damages to the Debtors.

On April 29, 2003, the Committee filed the Application for authority to file and prosecute a complaint against the Sprint Corporation and the Sprint Companies on behalf of the Debtors. The Committee's proposed complaint alleges that the Sprint Companies misused the Management and

Services Agreements to gain substantial influence over the business operations and financial affairs of the Debtors, resulting in the Debtors' becoming "nothing more than mere instrumentalities, alter ego corporations and/or agents operating under the control and direction of" the Sprint Companies. Based upon these allegations, the Committee contends that the Sprint Companies should be held liable for the payment of the Debtors' debts under several legal theories, including common business enterprise, agency, and alter ego.

The Sprint Companies object to the Application. Following a hearing on the Application, the Court took this matter under advisement.

### Conclusions of Law

■ The ability to avoid fraudulent or preferential transfers and recover other property rights for the benefit of the estate is often an integral part of a debtor's attempts to reorganize. The statutes that create the ability to do so expressly state that the trustee is empowered to wield these powers on behalf of the estate. *See* 11 U.S.C. §§ 542; 544; 547; 548; 549; 550. In recognition of the fact that, in a reorganization, the appointment of a trustee is generally the exception, rather than the rule, the Bankruptcy Code vests a debtor-in-possession with the powers of a trustee in the event no trustee is appointed. *See* 11 U.S.C. § 1107(a).[1] Accordingly, a debtor-in-possession has the power to bring causes of action on behalf of the estate, such as avoidance actions.

■ A debtor may have additional causes of action at the time a bankruptcy case is commenced, which become property of the debtor's bankruptcy estate. *See*

11 U.S.C. § 541; *Miller v. Shallowford Community Hosp., Inc.,* 767 F.2d 1556 (11th Cir.1985). The prosecution of these claims may be equally, if not more, crucial to the success of the debtor's reorganization. Such may include claims against the debtor's officers and directors for mismanagement and waste or breach of contract claims against a third party. In the event that no trustee is appointed, the debtor-in-possession is authorized and, in fact, duty-bound, to assert cognizable claims in an effort to recover damages for the benefit of the estate. *See Louisiana World Exposition v. Federal Ins. Co.,* 858 F.2d 233, 245–46 (5th Cir.1988). Accordingly, the debtor-in-possession may bring any claim that the debtor may have brought prior to the filing of the bankruptcy case. *Id.*

It is clear to the Court that, assuming the Debtors have standing to bring alter ego/instrumentality claims against the Sprint Companies, the Debtors, acting in their capacities as debtors-in-possession, would be authorized to bring these claims on behalf of the estates. The questions before the Court are: 1) whether derivative standing exists such that the Committee could bring these claims on behalf of the estate; and 2) if such standing exists, whether the Court should allow the Committee to exercise it by filing a complaint.

While the Committee urges the Court to answer both questions in the affirmative, the Sprint Companies oppose such a resolution of these issues. The Sprint Companies first argue that, under the plain language of the Bankruptcy Code and recent Supreme Court authority, a creditors' committee does not have standing to pursue litigation on behalf of a debtor's estate.

---

**1.** Section 1107(a) of the Code provides: "(a) Subject to any limitations on a trustee serving in a case under this chapter, ... a debtor-in possession shall have all the rights, other than the right to compensation under § 330 ..., and powers, and shall perform all the functions and duties ... of a trustee ...." 11 U.S.C. § 1107(a).

Further, the Sprint Companies assert that, even if such standing did exist, the Committee has failed to demonstrate, and cannot demonstrate, that the proposed litigation would be in the best interest of the Debtors' estates.

I. *Whether the Committee has Standing to Pursue the Instant Litigation on Behalf of the Debtors' Estates*

As discussed above, the Bankruptcy Code vests authority to sue on behalf of the bankruptcy estate in the trustee, or, in a Chapter 11 case in which no trustee is appointed, the debtor-in-possession. 11 U.S.C. §§ 323; 1107. Pursuant to § 1103, a creditors' committee may: 1) consult with the trustee or debtor-in-possession concerning the administration of the case; 2) investigate the acts, conduct, assets, liabilities, and financial condition of the debtor and other matters relevant to the case; 3) participate in the formulation of a plan; 4) request to appointment of a trustee or examiner; and 5) perform such other services as are in the interest of those represented by the committee. *Id.* § 1103(c). Section 1109(b) provides certain parties, including a creditors' committee, the right to "raise" and "appear and be heard on any issue." *Id.* § 1109(b). The Committee maintains that the combined effect of §§ 1103(c)(5) and 1109(b) is to grant a creditors' committee the right to pursue litigation on behalf of the estate when the debtor-in-possession fails to do so and it would be in the best interest of the estate.

The Sprint Companies point to the plain language of § 323, which states that the trustee has the authority to sue and be sued, and urge the Court to enforce the statute according to its terms. As the Sprint Companies note, the United States Supreme Court recently addressed a similar issue of standing in the bankruptcy context. In *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 530 U.S. 1, 14, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000), the Court held that, based upon the plain language of § 506(c), an administrative expense claimant has no independent right to surcharge a secured creditor's collateral. The Sprint Companies acknowledge that the Court expressly declined to determine whether a party, other than the trustee, would have derivative standing to pursue such a surcharge. *Id.* at 13 n. 5, 120 S.Ct. 1942.[2] Nonetheless, they urge this Court to consider the Supreme Court's analysis and its admonishment that "Congress 'says in a statute what it means and means in a statute what it says there.'" *Id.* at 6, 120 S.Ct. 1942 ("[W]hen the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.").

The Court has carefully considered the various opinions that have been rendered, both before and after the Supreme Court handed down its opinion in *Hartford,* on

---

**2.** In footnote 5 of its decision in *Hartford Underwriters,* the Supreme Court stated:

> We do not address whether a bankruptcy court can allow other interested parties to act in the trustee's stead in pursuing recovery under § 506(c). *Amici* American Insurance Association and National Union Fire Insurance Co. draw our attention to the practice of some courts of allowing creditors or creditors' committees a derivative right to bring avoidance actions when the trustee refuses to do so, even though the

applicable Code provisions, see 11 U.S.C. §§ 544, 545, 547(b), 548(a), 549(a), mention only the trustee. *See, e.g., In re Gibson Group, Inc.,* 66 F.3d 1436, 1438 (C.A.6 1995). Whatever the validity of that practice, it has no analogous application here, since petitioner did not ask the trustee to pursue payment under § 506(c) and did not seek permission from the Bankruptcy Court to take such action in the trustee's stead. *Hartford,* 530 U.S. at 13 n. 5, 120 S.Ct. 1942.

the issue of derivative standing. *See, e.g., Official Committee of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery,* 330 F.3d 548 (3d Cir. 2003); *In re Commodore Int'l, Ltd.,* 262 F.3d 96 (2d Cir.2001); *In re Gibson,* 66 F.3d 1436 (6th Cir.1995) (holding that, under certain circumstances, a creditor or creditors' committee may have derivative standing to bring an avoidance action); *Fogel v. Zell,* 221 F.3d 955 (7th Cir.2000) ("If a trustee unjustifiably refuses a demand to bring an action to enforce a colorable claim of a creditor, the creditor may obtain the permission of the bankruptcy court to bring the action in place of, and in the name of, the trustee."); *Louisiana World Exposition v. Federal Ins. Co.,* 858 F.2d 233, 245–46 (5th Cir.1988); *Jefferson Board of County Commissioners v. Voinovich (In re The V. Companies),* 292 B.R. 290 (6th Cir. BAP 2003); *In re Together Development Corp.,* 262 B.R. 586 (Bankr. D.Mass.2001) (unsecured creditors' committee is authorized to file complaint on behalf of estate pursuant to §§ 1103(c)(5) and 1109(b)); *Surf N Sun Apts., Inc. v. Dempsey,* 253 B.R. 490 (M.D.Fla.1999) (recognizing that bankruptcy courts' equity powers are limited by the plain language of the Code and cannot be used to create derivative standing).

The Court is persuaded most by the reasoning employed by the majority of the Third Circuit Court of Appeals in the *Cybergenics* decision. After examining §§ 1109(b), 1103(c)(5), and 503(b)(3)(B), that court concluded that "Congress recognized and approved of derivative standing for creditors' committees." *In re Cybergenics,* 330 F.3d at 566. The court noted that § 1109(b) "evinces Congress's intent for creditors' committees to play a vibrant and central role in Chapter 11 adversarial proceedings" and § 1103(c)(5) "suggests that Congress intended for creditors' committees to perform services on behalf of the estate" and "consciously built a measure of flexibility into the scope of those services." The court concluded that, "[a]s the question before us today is whether a bankruptcy court can authorize a creditors' committee to represent the estate when the usual representative is delinquent, the 'flexible representation' role evidenced in § 1103(c)(5) militates in the affirmative." Finally, the court looked to § 503(b)(3)(B), which authorizes a creditor, who has expended money in order to successfully recover for the benefit of the estate property concealed or transferred by the debtor, to recover those expenses as a priority expense. The court reasoned that if a creditor lacked standing to pursue a claim to recover fraudulently transferred property, it would make little sense for Congress to have included a provision in the Code dealing with reimbursement of expenses incurred in bringing such a cause of action. *Id.*

While the court acknowledged that neither § 1103(c)(5), § 1109(b), nor § 503(b)(3)(B) directly authorizes a creditors' committee to initiate litigation on behalf of the estate, the court concluded that "the ability to confer derivative standing upon creditors' committees is a straightforward application of bankruptcy courts' equitable powers." *Id.* Accordingly, it is the bankruptcy court's equitable powers that may be used to "craft flexible remedies that, while not expressly authorized by the Code, effect the result the Code was designed to obtain." *Id.* at 568.

The "result" that the Code was designed to obtain at issue in the *Cybergenics* case was the recovery of fraudulently transferred property for the benefit of the reorganizing debtor and its creditors. The court explained that the management of the debtor may often be lax in pursuing such avoidance actions due to certain conflicts of inter-

est. *Id.* at 573. For example, management itself may be the recipient of the transfer, in the case of an employee bonus, or, the debtor's management may simply wish to "avoid reputational self-immolation" that would accompany the reversal of a management-sanctioned transaction. *Id.* Alternatively, the debtor-in-possession "might be too financially weakened to advocate vigorously for itself." *Id.*

█ It would appear to the Court that an equally important "result," which the Code has been designed to obtain, is the recovery and collection of estate property, including the prosecution of causes of action held by the debtor that may result in an increase in the amount of money available for distribution to creditors. To that aim, if a debtor has a cognizable claim, but refuses to pursue that claim, an important objective of the Code would be impeded if the bankruptcy court has no power to authorize another party to proceed on behalf of the estate in the debtor's stead. *See, e.g., Cybergenics,* 330 F.3d at 576–79 (considering the argument that derivative standing is not critical to achieving the goals of the Code because of the alternative remedies available, such as appointment of a Chapter 11 trustee or conversion of the bankruptcy case to Chapter 7, and concluding that "on balance, derivative standing is a valuable tool for creditors and courts alike in Chapter 11 proceedings, and . . . [none] of the proffered alternatives could serve as a realistic substitute for that standing"). The Court agrees with the analysis and reasoning of the *Cybergenics* decision and finds it equally applicable in this context. Assuming these claims are colorable, not pursuing them would potentially impede the Code's objective of collecting estate property for the benefit of the Debtors and their creditors. Accordingly, the Court finds that, in this

context, derivative standing "seems clearly to 'give effect to the policy of the legislature.'" *Cybergenics,* 330 F.3d at 579–80 (quoting *Mitchell v. Robert DeMario Jewelry, Inc.,* 361 U.S. 288, 292, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960)).

## II. *Whether the Court Should Authorize the Committee to Exercise Derivative Standing*

The courts that have considered the question of whether to allow a party to exercise derivative standing have crafted a variety of tests, most of which result in consideration of the same factors. *See Louisiana World Exposition v. Federal Ins. Co.,* 858 F.2d 233 (5th Cir.1988) (requiring that "the claim be colorable, that the debtor-in-possession have refused unjustifiably to pursue the claim, and that the committee first receive leave to sue from the bankruptcy court"); *Fogel v. Zell,* 221 F.3d 955 (7th Cir.2000) (allowing committee to bring claims with the bankruptcy court's permission when the "trustee unjustifiably refuses a demand to bring an action to enforce a colorable claim of a creditor"); *In re Gibson Group,* 66 F.3d 1436 (6th Cir.1995) ("[W]e hold that a creditor or creditors' committee may have derivative standing to initiate an avoidance action where: 1) a demand has been made upon the statutorily authorized party to take action; 2) the demand is declined; 3) a colorable claim that would benefit the estate if successful exists, based on a cost-benefit analysis performed by the court, and 4) the inaction is an abuse of discretion ('unjustified') in light of the debtor-in-possession's duties in a Chapter 11 case.").

█ In a case such as this, when the trustee or debtor-in-possession consents to the committee's request to file suit, courts have allowed the committee to do so upon a showing that "suit by the committee is (a) in the best interest of the bankruptcy

estate, and (b) is 'necessary and beneficial' to the fair and efficient resolution of the bankruptcy proceedings." *In re Commodore Intern., Ltd.,* 262 F.3d 96 (2d Cir. 2001); *see also In re Spaulding Composites Co., Inc.,* 207 B.R. 899 (9th Cir. BAP 1997) ("The question, then, is whether a DIP may stipulate to representation by an unsecured creditors' committee. We hold that it may."). Similarly, when the debtor-in-possession has consented to the suit, the court need not give strict consideration to the question of whether the debtor-in-possession has unjustifiably refused to initiate suit. *See In re Valley Park, Inc.,* 217 B.R. 864 (Bankr.D.Mont.1998) ("This consent, coupled with Terry Parks' obvious reluctance, as DIP's president, to initiate avoidance proceedings against himself and trust entities of which he and his family are beneficiaries, obviates the need for strict application of the first, second, and fourth considerations from *Gibson* ....."); *see also In re Colfor,* No. 96–60306, 1998 WL 70718, at *2 (Bankr.N.D. Ohio Jan. 5 1998) ("This Court likewise finds it unnecessary for the Committee to ask the Debtors to pursue this claim and have the Debtors refuse when the Debtors have already agreed to allow the Committee to pursue the possibility of an equitable subordination claim ....").

 When the party seeking derivative standing has the consent of the debtor-in-possession, the most important factor to be considered is whether the claims are colorable. It is clear that, if the claims lack any merit whatsoever, allowing another party to pursue the claims at the expense of the bankruptcy estate would neither be in the best interest of the estate nor necessary and beneficial to the efficient resolution of the bankruptcy proceedings. On the issue of whether a claim is "colorable," the Court should consider whether the "Committee has asserted 'claims for relief that on appropriate proof would support a recovery.'" *In re Tennessee Valley Steel Corp.,* 183 B.R. 795, 800 (Bankr.E.D.Tenn.1995) (quoting *In re STN Enterprises, Inc.,* 779 F.2d 901, 905 (2d Cir.1985)). "Because the creditors' committee is not required to present its proof, the first inquiry is much the same as that undertaken when a defendant moves to dismiss a complaint for failure to state a claim." *In re America's Hobby Center, Inc.,* 223 B.R. 275, 282 (Bankr.S.D.N.Y. 1998); *see also In re KDI Holdings, Inc.,* 277 B.R. 493 (Bankr.S.D.N.Y.1999); *In re Valley Park, Inc.,* 217 B.R. at 869 n. 4 (the committee "does not have to satisfy the quantum of proof necessary for a judgment in order to show a colorable claim"). While the Court need not "conduct a mini-trial" of the claims, the Sprint Companies are correct in pointing out that the Court may weigh the "probability of success and financial recovery," as well as the anticipated costs of litigation, as part of a cost/benefit analysis conducted to determine whether pursuit of the colorable claims are likely to benefit the estate. *America's Hobby Center, Inc.,* 223 B.R. at 282.; *see also In re KDI Holdings,* 277 B.R. at 509 ("As to a claim's potential benefit to the reorganization estate, the Court must consider the probability of 'legal success and potential financial recovery' to the estate, 'whether it would be preferable to appoint a trustee,' and 'the terms relative to attorneys' fee on which suit might be brought.'"). Such an analysis is designed to ensure that the expected benefit to the estate will be reasonably sufficient to "'justify the anticipated delay and expense to the bankruptcy estate that the initiation and continuation of litigation will likely produce.'" *Id.* (quoting *STN Enterprises, Inc.,* 779 F.2d at 906).

## A. *Whether the Claims are Colorable*

First, the Court will consider whether the Committee's claim is colorable, or, in

other words, whether the claim would survive a motion to dismiss for failure to state a claim. When considering a motion to dismiss, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). "As this standard indicates, the complaint must be construed in the light most favorable to the plaintiff, and the facts as alleged must be accepted as true." *In re Jones,* 277 B.R. 816 (Bankr.M.D.Ga.2001) (citing *Kirby v. Siegelman,* 195 F.3d 1285, 1289 (11th Cir. 1999)). However, the court need not accept as true conclusions of law asserted in the complaint. *See In re Barton,* 266 B.R. 922 (Bankr.S.D.Ga.2001) (citing *Solis–Ramirez v. United States,* 758 F.2d 1426, 1429 (11th Cir.1985)).

 The parties appear to be in agreement that the Committee's claim for relief under any veil piercing theory must be reviewed in accordance with Delaware law. *See Fletcher v. Atex, Inc.,* 68 F.3d 1451, 1456 (2d Cir.1995). As Delaware courts are reluctant to ignore the corporate form, a party seeking to pierce the corporate veil must meet a high burden. *See Harco Nat'l Ins. Co. v. Green Farms, Inc.* 1989 WL 110537 at *4 (Del.Ch.1989). "The alter ego theory is premised on the idea that the corporate entity in question is really a sham, controlled exclusively for the benefit of another, such as a parent company or dominant shareholder." *Trans Union LLC v. Credit Research, Inc.,* 2001 WL 648953 (N.D.Ill. June 4, 2001). "To state a cognizable claim for piercing the corporate veil under Delaware law, the plaintiff must allege facts that, if taken as true, demonstrate the defendant's complete domination and control over the corporation." *Northern Laminate Sales,*

*Inc. v. Matthews,* 249 F.Supp.2d 130 (D.N.H.2003) (citing *Wallace v. Wood,* 752 A.2d 1175, 1183 (Del.Ch.1999)). "This degree of control requires 'exclusive domination and control ... to the point that [the corporation] no longer ha[s] legal or independent significance of [its] own.'" *Id.* Further, the alter ego theory "'requires that the corporate structure cause fraud or similar injustice.'" *Id.* (citing *Outokumpu Eng'g Enter., Inc. v. Kvaerner Enviropower, Inc.,* 685 A.2d 724, 729 (Del.Super.1996)).

 The Sprint Companies assert that Delaware law requires some legal relationship, such as a parent-subsidiary relationship, between two corporations before the Debtors' corporate veil may be pierced. In this case, the Sprint Companies point to their lack of any ownership interest in the Debtors and the fact that they do not even share common officers or directors. In response, the Committee appears to contend that it need only allege facts to establish that the Sprint Companies have "the requisite domination and control over" the Debtors. Accordingly, the parties disagree as to whether an ownership interest is a necessary element to the alter ego theory of veil piercing.

The Court's research reveals that courts addressing this issue under the laws of California, Texas, and Hawaii have held that an ownership interest is "a prerequisite to alter ego liability, and not a mere 'factor' or 'guideline.'" *SEC v. Hickey,* 322 F.3d 1123, 1128 (9th Cir.2003) (under California law, test for alter ego liability requires "such a unity of interest and ownership that the individuality, or separateness, of the said person and corporation has ceased"; "[h]owever much control [an individual] may have over [a corporation,] .... [o]wnership is a prerequisite to alter ego liability"); *Permian Petroleum Co. v. Petroleos Mexicanos,* 934 F.2d 635, 643

(agreeing that "Texas courts will not apply the alter ego doctrine to directly or reversely pierce the corporate veil unless one of the 'alter egos' owns stock in the other"); *see also Estate of Daily v. Title Guaranty Escrow Svc., Inc.,* 178 B.R. 837 (D.Hawai'i 1995) ("Hawaii courts have indicated that stock ownership is a necessary element for a conventional alter ego action."), *aff'd, Estate of Daily v. Lilipuna Associates,* 81 F.3d 167 (9th Cir.1996) (finding the most important factor militating against piercing the veil was the lack of stock ownership and noting that "[e]xisting cases strongly suggest that stock ownership is a necessary predicate to any veil piercing claim in Hawaii"). *But see Century Hotels v. United States,* 952 F.2d 107, 110–11 (5th Cir.1992) (under Louisiana law, the court stated that "the fact that Smith did not hold Crismar stock is a factor, but it does not preclude the finding of alter ego when control is otherwise established").

However, the Court has also located cases in which state law supports an "instrumentality" theory of veil piercing, which does not appear to require an ownership interest. *See In re KDI Holdings, Inc.,* 277 B.R. 493 (Bankr.S.D.N.Y.1999) (finding claims of lender liability through an instrumentality theory were "colorable" under New York law; "the Court finds that the Committee has alleged sufficient facts to establish the control element of the lender liability claim"; "the Committee alleges that by making the … Loans, Schneider and Austin gained actual managerial and voting control over the Debtors"); *Great West Casualty Co. v. Travelers Indemnity Co.,* 925 F.Supp. 1455 (D.S.D.1996) (holding that South Dakota law would recognize an "instrumentality" theory for holding a lender liable for the debts of a borrower); *James E. McFadden, Inc. v. Baltimore Contractors, Inc.,* 609 F.Supp. 1102 (E.D.Pa.1985) (utilizing an instrumentality theory under Maryland law to determine whether a creditor "took total and actual control over" its debtor). The case most cited for the proposition that an ownership interest is not a necessary element is *Krivo Indus. Supply Co. v. Nat'l Distillers and Chem. Corp.,* 483 F.2d 1098 (5th Cir.1973).

In *Krivo,* the Fifth Circuit Court of Appeals, applying Alabama law, addressed the issue of whether a creditor could be held liable for the debts of its debtor, notwithstanding the fact that the creditor did not have any ownership interest in the debtor. According to the court, the *Krivo* case did not involve questions of fraud or deceit, but rather the "narrow rule of corporation law known as the 'instrumentality' doctrine." *Id.* at 1102. The court described the theory as being applicable to hold one corporation liable for the debts of another corporation when either: 1) the corporation expressly or impliedly assumes responsibility for the debts of another corporation by "indicating to the creditors of the other corporation that it stands behind those debts as a guarantor"; or 2) the corporation "misuses" another corporation "by treating it, and by using it, as a mere business conduit for the purposes of the dominant corporation." *Id.* The court characterized the second variation of the doctrine as an equitable means of disregarding the corporate form of the subservient corporation "so as to affix liability where it justly belongs." *Id.* at 1103. Under the "instrumentality" doctrine, there are two essential elements: "First, the dominant corporation must have controlled the subservient corporation, and second, the dominant corporation must have proximately caused the plaintiff harm through misuse of this control." *Id.* As to the extent of control necessary, after reviewing various cases, the court concluded that the fact that the dominant corporation

owns no stock in the subservient corporation is not *per se* fatal to a finding of sufficient control, but the evidence must establish that the dominant corporation exerted "actual, operative, total control" such that the subservient corporation has " 'no separate mind, will or existence of its own and [was] but a business conduit" ' for the dominant corporation. *Id.* at 1104, 1109.

In *Irwin & Leighton, Inc. v. W.M. Anderson Company*, 532 A.2d 983, 984 (Del. Ch.1987), the court cited the *Krivo* case with approval when called upon to determine whether "a creditor who involved itself in the management of its troubled debtor is to be held answerable for a liability of that debtor to a third person arising from a breach of contract." The court noted that, while the traditional veil-piercing analysis is most applicable to controlling shareholders, "in some few instances, . . . it has been acknowledged that one, other than a shareholder, who is in control of and has misused a corporate structure may be held answerable for a corporate liability." *Id.* at 987 (citing *Philadelphia Storage Battery Co. v. R.C.A.*, 194 A. 414 (Del.Ch.1937), as having acknowledged the possibility, but not actually disregarding the corporate entity). After reviewing the evidence submitted by the parties on the defendant's motion for summary judgment, the court concluded that there was insufficient evidence to establish that the defendant had exercised sufficient control over the debtor so as to justify disregarding the corporate status of the debtor. *Id.* at 989.[3]

There does not appear to be a substantial body of Delaware law that would support the extension of the instrumentality theory to cover lender liability or other situations in which the dominant corporation is not the parent of the subservient corporation. That being said, the Court has found no case in which a court applying Delaware law has refused to consider the instrumentality theory on the basis of a lack of ownership interest. The rationale of the instrumentality theory, as it applies to third parties, such as creditors, would appear to be consistent with the general use of veil piercing as an equitable remedy by Delaware courts. If complete domination and control of a subsidiary, coupled by a misuse of that control, by a parent corporation can form the basis for disregarding the corporate form, then it would seem logical to reason that the complete domination and control of a subservient corporation by an unrelated corporation may also form such a basis. The question should be whether the dominant corporation completely dominated and controlled the corporation, "whether that control arose out of" stock ownership, large advances of credit, or otherwise. *Krivo*, 483 F.2d at 1104, 1114.

Because the "determination of the nature and extent of domination is a question of fact," the Court will review the Committee's proposed complaint to determine whether the Committee has alleged sufficient facts to support a finding that the Sprint Companies exerted "actual, participatory, total" control over the Debtors. To establish that these claims are colorable, the Committee must allege facts that would support a finding that the Sprint Companies misused this control and that the misuse proximately caused the Debtors harm. It is insufficient for the Committee to "make conclusory allegations of control," but rather, it must set "forth

---

**3.** It is not perfectly clear that the *Irwin & Leighton* court actually applied Delaware law. The corporation at issue was incorporated in Pennsylvania, but the court did not directly address the issue of which state law it would apply. However, throughout the opinion, the court generally cited to Delaware law.

some examples of alleged domination" and "specific factual allegations." *In re Sunbeam*, 284 B.R. 355, 365–66 (Bankr. S.D.N.Y.2002).

■ The Committee's proposed complaint alleges that the Sprint Companies entered into contractual agreements with the Debtors for the purpose of conducting their wireless communication business. Through these contracts, the Committee contends, the Sprint Companies were able to "exert pervasive domination and control over the business activities of" the Debtors. [Committee's Complaint, ¶ 2]. As examples of the control exerted, the complaint alleges that:

–The Sprint Companies entered "one-sided contractual agreements" with the Debtors, which gave the Sprint Companies "substantial influence over the business operations and financial performance of" the Debtors. [Committee's Complaint, ¶ 21]. Through the contracts, the Sprint Companies "assured [themselves] an effective veto power over [the Debtors'] business affairs and operations." [Committee's Complaint, ¶ 35]. The contracts have given the Sprint Companies control over the Debtors' ability to raise capital and finance the network, network construction plans, technology used in the Debtors' network, quality standards used throughout the Debtors' network, the technical requirements for the Debtors' networks, including switching technology, the pricing for services rendered by the Debtors, the Debtors' credit policies, the Debtor's ability to offer, promote, and market its products and services, the Debtors' sales and distribution channels, the Debtors' marketing and packaging, the Debtors' provision of customer service and customer care requirements, and the per minute "roaming" charges that affect the Debtors' network. [Committee's Complaint, ¶ 36].

–The Sprint Companies required the Debtors to submit their plans for funding and implementing the "build-out" of the Sprint PCS network for their review and approval. [Committee's Complaint, ¶ 3]. The Sprint Companies withheld this approval until the Debtors agreed to make "numerous changes" to these plans. [Committee's Complaint, ¶ 27].

–The Sprint Companies oversaw the Debtors' design and construction of the wireless communication network, including the approval of specific equipment and other network infrastructure. [Committee's Complaint, ¶ 3]. The Sprint Companies provided the Debtors with "highly specific guidelines and directions concerning the switching technology, software, equipment and network infrastructure that the [Sprint Companies] demanded the Debtors put in place." [Committee's Complaint, ¶ 27]. The Sprint Companies required the Debtors to participate in weekly meetings to report the Debtors' progress and to take direction from the Sprint Companies with respect to the "critical portions" of the "build out." [Committee's Complaint, ¶ 28].

–The Sprint Companies required the Debtors to raise substantial debt and equity capital. [Committee's Complaint, ¶ 31]. The Sprint Companies required the Debtors to submit the financing plan to them for approval. [Committee's Complaint, ¶ 33]. The Sprint Companies withheld approval of the financing plan only after requiring the Debtors to make various changes in the offering materials. [Committee's Complaint, ¶ 33].

–The Sprint Companies controlled the Debtors' cash flow by controlling its billing and collection services. The Sprint Companies required the Debtors to deposit subscriber revenue that it received from its retail outlets into a common bank account that was "swept" daily into bank

accounts controlled by the Sprint Companies. [Committee's Complaint, ¶ 39]. The Sprint Companies had the authority and responsibility to determine the amounts due to the Debtors under the contract and to determine when to pay the amounts owed to the Debtors. [Committee's Complaint, ¶¶ 41–43]. The Sprint Companies refused to open the books and records for review and audit by the Debtors. [Committee's Complaint, ¶ 41]. The Sprint Companies have failed to remit funds owed to the Debtors and maintain complete control over these funds. The Sprint Companies have used the Debtors' and the Sprint Companies' funds "interchangeably."

–The Sprint Companies directed the Debtors to raise capital and finance the Debtors' business operations through the offering of certain notes. [Committee's Complaint, ¶ 3].

–The Sprint Companies required the Debtors to participate in a no-deposit program that eliminated the requirement that subscribers with bad credit pay a deposit. [Committee's Complaint, ¶ 47].

As to the issue of whether the Sprint Companies misused this control and whether the misuse proximately caused the Debtors harm, the complaint alleges that the Sprint Companies have "completely misused" their domination and control over the Debtors by abusing the contractual relationship, refusing to timely pay sums due to the Debtors, and engaging in self-dealing transactions, which have benefitted the Sprint Companies "on terms wholly unfavorable to" the Debtors. [Committee's Complaint, ¶ 5]. As specific examples of the Sprint Companies' "misuse," of its control over the Debtors' business operations, the complaint alleges that:

–The Sprint Companies have used their control over the Debtors to "foist program requirements and costly services" on the Debtors that would be available to the Debtors from third parties on more favorable terms. [Committee's Complaint, ¶ 44]. For example, the Sprint Companies forced the Debtors to use long distance telephone services provided by its parent company, Sprint Corporation, at rates that are "commercially unreasonable and significantly higher than otherwise available" the Debtors in the marketplace.

–The Sprint Companies have unilaterally set fees at a "commercially unreasonable" level and imposed charges on the Debtors, such as incidental billings, that are not authorized by the contracts. [Committee's Complaint, ¶¶ 45, 48].

–The Sprint Companies' misuse of its domination and control has "caused substantial harm" to the Debtors, resulting in the Debtors' inability to satisfy their debts. [Committee's Complaint, ¶ 5]. The Sprint Companies have arbitrarily decreased the amount of revenue payable to the Debtors and have failed to pay the Debtors all of the monies to which they are entitled to under the contracts, providing a benefit to themselves and causing "great financial loss and harm" to the Debtors. [Committee's Complaint, ¶¶ 51].

The Court agrees that, taken together, these facts tend to show that the Sprint Companies have been able to control the Debtors' finances, pricing, credit policies, and the general operation of the business. Because it appears that the Debtors' business is substantially dependent upon the contracts with the Sprint Companies, it is not difficult to imagine that, once the contracts were in place and the work undertaken to build the network, the Debtors' management may not have had any alternative but to follow the direction of the Sprint Companies and to acquiesce to the wishes of the Sprint Companies with regard to each and every decision. Additionally, the alleged facts tend to suggest

that the Sprint Companies misused their control over the Debtors by essentially rewriting the contracts to gain an unfair advantage over the Debtors, by disregarding the terms of the contracts and refusing to pay amounts owed to the Debtors, and by requiring the Debtors to deal with the Sprint Companies on commercially unreasonable terms. At this stage, the Court cannot determine that the evidence will show that the Sprint Companies exerted "actual, operative, total control" such that the Debtors had " 'no separate mind, will or existence of [their] own and [were] but a business conduit' " for the Sprint Companies. However, the Court must conclude that the Committee has alleged sufficient facts to show at least a "colorable" claim.[4]

■ Finally, the Sprint Companies contend that, under Delaware law, the Debtor has no standing to pierce its own veil, as would be required for the Sprint Companies to be held liable for the Debtors' debts under an instrumentality theory. In response, the Committee points to the case of *Pereira v. Cogan,* No. 00 CIV 619, 2001 WL 243537 (S.D.N.Y.2001), in which the court explained that a "trustee of a corporate debtor has standing to pierce the corporate veil, based on an alter ego theory, as against the controlling stockholder if: (1) 'under governing state law the debtor could have asserted an alter ego claim to pierce its own corporate veil,' ... and; (2) 'the claim is a general one ... [which] could be brought by any creditor.' " *Id.* at *19 (internal citations omitted) (quoting *Kalb, Voorhis & Co. v. American Fin. Corp.,* 8 F.3d 130 (2d Cir.1993)). The Committee urges the Court to follow the holding of *Pereira,* in which the court concluded that Delaware law would allow a

bankrupt corporation to pierce its own corporate veil to hold its parent corporation or controlling shareholders liable for its just debts. *Id.* at *20 (citing *Murray v. Miner,* 876 F.Supp. 512 (S.D.N.Y.1995)).

The Sprint Companies assert that these cases are inapposite in that the basis for their holdings was that the claims being asserted by the bankrupt corporation against its parent were similar to claims that could have been asserted under Delaware law against a parent by a subsidiary for breaches of fiduciary duties. Here, the Sprint Companies argue, they and the Debtors have no parent/subsidiary relationship and the Sprint Companies owe no fiduciary duties to the Debtors.

The Court has considered the reasoning of the *Pereira* and *Murray* courts, as well as other cases that have addressed this issue, and is persuaded that Delaware law would allow a debtor-in-possession to pursue this type of claim. The Fifth Circuit Court of Appeals has held that, "even though, under Texas law, claims based on alter ego and other piercing-the-corporate-veil theories are typically brought by a creditor, nothing prevents a corporation from asserting such a claim against its own subsidiary or affiliated companies." *In re Schimmelpenninck,* 183 F.3d 347, 355 (5th Cir.1999) (citing *S.I. Acquisition v. Eastway Delivery Service (In re S.I. Acquisition),* 817 F.2d 1142 (5th Cir.1987)). In so holding, the court's reasoning was twofold. First, the court noted that the policy behind state law veil-piercing theories is to use an equitable remedy to hold the party who has controlled and misused a corporation liable for the corporate obligations. Second, the court reasoned that allowing the representative of a corporation's bank-

---

4. The complaint also asserts liability against the Sprint Companies for the Debtors' debts under an agency theory and a common business enterprise theory. Because the Court

has determined that the instrumentality theory may be viable, the Court need not discuss the alternative theories at this time.

ruptcy estate to assert the claim, rather than an individual creditor, furthers a goal of the Bankruptcy Code of providing similarly situated creditors with an equal distribution. *Id.* at 355–56 ("Otherwise, any creditor could seek remuneration from the debtor's affiliates, and the multi-jurisdictional, first-come/first-served, unequal distribution, which cuts against the policies of the Code, would be promoted.").

It would seem to the Court that the policies that persuaded the Fifth Circuit Court of Appeals that alter ego claims against a debtor's parent or subsidiary should be brought by the trustee, rather than by the individual creditors, would support a similar finding in this case. The Committee is essentially asking the Court to use equitable principles to treat the Sprint Companies as if they were the parent company of the Debtors, based on the theory that the Sprint Companies have acted as if they are the parent company of the Debtors. The Sprint Companies are being accused of exerting undue influence over the Debtors, just as if they had been the Debtors' parent company, to the detriment of the Debtors. Just as in the *Murray* case, where a controlled corporation "has sustained liability to third parties as a result of" the dominant corporation's control, the controlled corporation has suffered an injury and should have standing to pursue an equitable remedy against the dominant corporation. If the Committee's claims are valid, the Court sees no reason to distinguish between allowing the subsidiary of a parent company to pierce its own corporate veil to hold the parent company liable for its just debts and allowing the corporate veils to hold the Sprint Companies liable for the Debtors' just debts. In both cases, the injury is one that has been suffered by the corporation because of the exertion of control by another corporation, and the equitable remedy would be one that would provide a recovery to all of the

Debtors' creditors, rather than to a particular creditor. In such a case, the Court believes that the proper party to seek recovery would be the debtor-in-possession, or, in this case, the Committee, on behalf of the estates.

### B. *Whether the Exercise of Derivative Standing is in the Best Interest of the Estates*

As mentioned above, to determine whether the exercise of derivative standing by a Committee would be in the best interest of the estates, the Court may weigh the "probability of success and financial recovery," as well as the anticipated costs of litigation, as part of a cost/benefit analysis conducted to determine whether pursuit of the colorable claims are likely to benefit the estate. *America's Hobby Center, Inc.,* 223 B.R. at 282.

Because the Committee's theory of liability in this case is quite fact intensive and will heavily depend upon the persuasiveness of the Committee's evidence, the Court is not in a position to conclude necessarily that the Committee's complaint has a likelihood of success. That being said, the Court is persuaded that the potential financial recovery to the estates is significant. The fact that the Debtors, the Committee, and the Debtors' major secured creditor are all in fervent support of this action suggests to the Court that this potential recovery is worth taking the risk. As for the costs involved, the Court does not believe that allowing the Committee to file its complaint would result in significant additional cost. If the Court were to deny the Committee the opportunity to file its complaint, there is always the possibility that the Debtor would seek to amend its complaint to add these theories of recovery, or that the Committee would seek to intervene in the existing adversary proceeding. In any event, it would seem to

the Court that the cost of pursuing these theories of recovery and the cost of the Committee's participation in these matters will exist, regardless of whether a formal complaint is filed. The Committee has already expended the time and resources to research and draft its complaint. Additionally, the facts that will be pertinent to the Committee's complaint are already at issue in the Debtor's adversary proceeding. Therefore, it is likely that the necessary discovery will be largely duplicative of that already being produced and reviewed by the Debtors' attorneys. The Court is convinced that, if the Debtors and the Committee work together on these matters, the Committee's complaint will not result in significant additional costs.

While the Court is going to allow the Committee to file its complaint, the Court will also grant the Sprint Companies' request that these matters be consolidated into one adversary proceeding. It would be prudent for the Debtors and the Committee to cooperate in conducting discovery to avoid any duplication of efforts on the part of either the plaintiffs or the Sprint Companies. To that end, the parties should use their best efforts to develop a discovery plan and a proposed scheduling order that accomplishes this goal. The Court will certainly be available to hold any scheduling or discovery conferences that the parties deem necessary.

### CONCLUSION

For the reasons stated above, the Committee's Application to Commence Suit is hereby **GRANTED**. An order consolidating the adversary proceedings will be entered once the complaint has been filed.

**IT IS SO ORDERED.**