**In re LTV STEEL COMPANY, INC., et al., Debtors.**

**No. 00–43866.**

United States Bankruptcy Court, N.D. Ohio, Eastern Division.

Sept. 2, 2005.

Ryan Routh, Jones Day, Cleveland, OH, for Debtors.

### MEMORANDUM OF OPINION AND ORDER

RANDOLPH BAXTER, Chief Bankruptcy Judge.

The matter before the Court is the motion of the Official Committee of Administrative Claimants ("ACC") for an order authorizing it to commence and prosecute certain causes of action against certain directors and officers of LTV Steel[1] and LTV Steel Corporation[2] on behalf of the

---

1. LTV Steel is a New Jersey Corporation which maintained its principal place of business and corporate headquarters in Cleveland, Ohio.

2. LTV Corporation is a Delaware Corporation

LTV bankruptcy estate. The Court acquires core matter jurisdiction over the instant matter pursuant to 28 U.S.C. §§ 157(a) and (b), 28 U.S.C. § 1334, and General Order Number 84 of this District. The following findings and conclusions are rendered pursuant to Bankruptcy Rule 7052.

## BACKGROUND

It is undisputed that since its appointment in February of 2003, the Administrative Claimants Committee (ACC) has investigated prepetition and postpetition conduct of LTV Corporation and LTV Steel directors and officers. The Official Committee of Unsecured Creditors was disbanded after the appointment of the ACC. The ACC's motion is premised upon the ACC's allegations of multiple acts of malfeasance by officers and directors of LTV Steel and LTV Corporation which purportedly caused LTV Steel's demise. Prior to its demise, LTV was the third largest integrated steel company in the United States.

The ACC contends generally that, rather than carry out their duty to creditors to preserve the value of the LTV Steel bankruptcy estate and maximize the recovery for creditors and claimants, the Defendants and, in particular, proposed Defendants William H. Bricker, Chairman and Chief Executive Officer of LTV Corporation from November 9, 2000 through November 29, 2001, and John T. Turner, Executive Vice President of LTV Corporation from April 28, 2000 through December 12, 2001, engaged in self-dealing, improper or careless conduct which caused LTV Steel to incur unnecessary debt, and suffer substantial erosion of the value of its assets. As early as the Fall of 2000, LTV Steel was experiencing liquidity problems that would adversely affect the company. At an October 30, 2000 board meeting, it was decided that LTV Corporation and LTV Steel would move forward with bankruptcy plans. The ACC alleges that in at least November and December of 2000, LTV Corporation's and LTV Steel's boards and officers knew that bankruptcy preparations had begun, and that a bankruptcy filing was possible, if not likely. ACC argues that the proposed defendants, as directors and officers, allegedly caused harm to LTV Steel by allowing sales on credit to an affiliated entity they knew, or should have known, was going into bankruptcy, and against which LTV Steel would possess only a general unsecured claim unlikely to be paid in full. It further contends that, William H. Bricker is alleged to have contacted a certain investment firm in May or June of 2001, in an attempt to arrange financing that would allow him to purchase all or portions of LTV Steel when the company collapsed. The ACC believes that highly confidential information was shared by Bricker with that investment firm to further his self-interest.

In at least early September of 2001, at the latest, LTV Steel's and LTV Corporation's directors and officers appear to have been aware that LTV Steel may soon be unable to pay its postpetition debts. In mid-September 2001, LTV Steel implemented an "Immediate Liquidity Enhancement Program" ("ILEP") purportedly in an effort to generate sufficient liquidity to continue LTV Steel's operations and alleviate the rapidly-approaching cash shortfall. The ILEP was not disclosed publicly until the testimony of James F. Bonsall, the Chief Restructuring Officer of LTV Steel, at the December 5, 2001 Asset Protection

---

which maintained its principal place of business and corporate headquarters in Cleveland, Ohio.

Plan (APP) hearing. However, LTV Steel continued to incur additional trade debt which it either knew or should have known it could not pay in full at least up to the day the APP Motion was filed on November 20, 2001. The ACC believes that viable causes of action exist for the failure to disclose LTV's looming cash crisis and true financial condition from at least September 2001 through November 2001.

As of August 2001, LTV Steel's trade payables were approximately $115 million. In September, October and November 2001, however, LTV Steel's accounts payable increased to between $140–150 million, despite the fact that LTV Steel had shut down or substantially scaled back operations at the time. LTV Steel's administrative creditors appear to have been forced, possibly through the workings of the "ILEP", to endure increased financial exposure and loss at a time when the company's true financial condition was concealed. The ILEP appears to have included, among its goals, an effort to secure additional trade credit at a time when vendors should have been advised that LTV Steel could not pay them. In addition, LTV may have withheld payments to vendors which were due. The ACC believes that viable causes of action exist for allowing or causing this increase, and stretching, of accounts payable during the Fall of 2001. The ACC estimates that the harm suffered by LTV Steel due to the increasing and stretching of trade payables is no less than $35 million, the amount of the increase in payables outstanding compared to LTV Steel's historic average.

The subject motion before the Court reflects that the ACC has determined that colorable causes of action exist against directors and officers for conduct which caused harm to LTV Steel, LTV Steel's bankruptcy estate and LTV's creditors generally. Exhibits attached to the mo-

tion reflect that the ACC has made the appropriate demand upon the Debtors to commence a lawsuit based upon its allegations. The Debtors have refused to bring such an action. The ACC contends that the causes of action could permit the recovery of damages of over $100 million which would inure to the benefit of the estate.

The ACC contends that based on its investigation, the directors and officers of LTV Corp and LTV Steel are subject to civil liability due to prepetition and postpetition conduct. The ACC has made several allegations of impropriety on the part of LTV Steel's directors and officers. The ACC seeks authority to prosecute causes of action against the named directors and officers and has submitted a proposed complaint for the Debtors review. The ACC also contends that it has alleged facts sufficient to assert a colorable claim against the Directors and officers for "deepening the insolvency" of LTV Steel and artificially and wrongfully prolonging the company's existence through the incurrence of spurious debt from at least September through November 20, 2001. Furthermore, the ACC contends that it will cost between $3–5 million to commence and prosecute the causes of action against a potential collection of $100 million. The ACC also believes that the Debtors have a $150 million insurance policy to cover any damages.

The Debtors filed a limited objection on the grounds that some of the alleged conduct does not meet the requirements of a colorable claim. The Debtors believe that the remainder of the claims must be subject to a cost-benefit analysis to determine whether the prosecution of the causes of action would benefit the estate. Specifically, Debtors' limited objection reflects that certain claims are not colorable; including: (1) Claims of intentional misconduct of

Glenn Moran (Moran also objects on the same basis), (2) Claims against unnamed defendant, aka DOES 1–100, (3) claims of fraud belonging to individual creditors not plead with specificity, (3) claims of breach of the duty of loyalty against defendants other than Messrs. Bricker and Turner without proper allegations of self-dealing, (4) claims of simple negligence (business judgment rule overcomes this claim), (5) claims of fraud or negligent misrepresentation which are routinely dismissed under Rule 12(b)(6) grounds., (6) claims based on the employment agreements of Messrs. Bricker and Turner despite court authority to implement said agreements, (7) the cost of litigation is uncertain and the damages alleged are speculative.

Glenn Moran, a former CEO of the Debtors also objects to the relief sought because he contends that the complaint does not allege colorable claims against him.

James J. Bansall, Jr., Managing Director of Alixpartners, LLC joined in Objection of Glenn J. Moran and stated that former Judge Bodoh issued a ruling that he, as Chief Restructuring Officer (CRO), was not an actual corporate officer of LTV and accordingly, this ruling is the law of the case to preclude him being name as a defendant.

LSI supports the relief sought by the ACC and urges the Court to give substantial weight to the desires of the Administrative Committee, which is the representative of independent parties with an economic stake in the outcome of the litigation, and give less deference to LTV Steel, whose corporate decision makers are individuals who are or could be defendants or third-party defendants if the lawsuit is prosecuted. There is no question that the Administrative Committee represents the constituency that stands to gain or lose based on the outcome of the litigation (including whether or not the litigation is pursued).

\* \*

The dispositive issue before the Court is whether colorable claims exist upon which the ACC should be authorized to prosecute the proposed complaint.

\* \* \*

■ Sections 1102(a)(1)(2), 1103(c)(2), and (5), and 1109(b) and Sixth Circuit authority govern the ACC's ability to prosecute derivative actions. Section 1102 provides, in part:

(a)(1) Except as provided in paragraph (3), as soon as practicable after the order for relief under chapter 11 of this title, the United States trustee shall appoint a committee of creditors holding unsecured claims and may appoint additional committees of creditors or of equity security holders as the United States trustee deems appropriate.

(2) On request of a party in interest, the court may order the appointment of additional committees of creditors or of equity security holders if necessary to assure adequate representation of creditors or of equity security holders. The United States trustee shall appoint any such committee. 11 U.S.C.A. § 1102(a)(1), (2).

11 U.S.C. § 1103 provides, in relevant part:

(c) A committee appointed under section 1102 of this title may—

(2) investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan;

———

(5) perform such other services as are in the interest of those represented.

11 U.S.C. §§ 1103(c)(2), (c)(5). 11 U.S.C. 1109 provides, in part:

> (b) A party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter.

11 U.S.C. § 1109(b). The Sixth Circuit has determined that a creditor's committee may have derivative standing to bring a derivative action if the committee can show: 1) that the creditor's committee has made a request of the debtor-in-possession regarding the initiation or prosecution of an action which will benefit the estate, 2) that the request has been refused, 3) a *prima facie* demonstration that a colorable claim exists which, if successful, would benefit the estate, and, 4) the creditor's committee's grounds for contending that the debtor-in-possession's inactivity on the claim is unjustifiable or abusive of their discretion. *See In re Gibson Group*, 66 F.3d 1436, 1446 (6th Cir.1995). *See also In re Caldor Corp.*, 303 F.3d 161 (2d Cir. 2002); *In re Marin Motor Oil, Inc.*, 689 F.2d 445 (3d Cir.1982); *In re Toledo Equipment Co., Inc.*, 35 B.R. 315, 320 (Bankr.N.D.Ohio 1983).

■ A colorable claim is defined as one which is plausible or "not without merit". *Jensen v. Schweiker*, 709 F.2d 1227, 1230 (8th Cir.1983); *In re Colfor, Inc.*, 1998 WL 70718, *2 (Bankr.N.D.Ohio 1998). This definition requires that the Court look beyond the complaint itself to at least some minimal evidentiary basis for the allegations, particularly, with respect to allegations of fraud. *Official Committee of Unsecured Creditors of Grand Eagle Companies, Inc. (In re Grand Eagle Companies, Inc.)*, 310 B.R. 79 (Bankr.N.D.Ohio 2004). The "colorable claim" requirement

is met if the committee has asserted claims for relief that on appropriate proof would allow a recovery. Courts have determined that a court need not conduct an evidentiary hearing, but must ensure that the claims do not "lack any merit whatsoever." *See Louisiana World Exposition v. Federal Ins. Co.*, 858 F.2d 233, 248 (5th Cir. 1988); *In re iPCS, Inc.*, 297 B.R. 283, 291 (Bankr.D.Ga.2003).

■ The court's inquiries will involve in the first instance not only a determination of probabilities of legal success and financial recovery in event of success, but also a determination as to whether it would be preferable to appoint a trustee in lieu of the creditors committee to bring suit. . . . *In re Gibson Group, Inc.*, 66 F.3d at 1446, *citing In re STN Enterprises*, 779 F.2d, 901, 905 (2d Cir.1985).

■ In determining whether a claim is colorable, a Bankruptcy Court should make a determination akin to that made on a motion to dismiss. *In re iPCS, Inc.*, 297 B.R. 283, 292 (Bankr.D.Ga.2003); *Official Comm. of Unsec. Creds. v. Austin Fin. Servs., Inc. (In re KDI Holdings, Inc.)*, 277 B.R. 493, 508 (Bankr.S.D.N.Y.1999); *In re America's Hobby Center, Inc.*, 223 B.R. 275, 282 (Bankr.S.D.N.Y.1998); *In re Valley Park, Inc.*, 217 B.R. 864, 869 n. 4 (Bankr.D.Mont.1998).

### PROPOSED COUNTS AND GIBSON ANALYSIS [3]

### COUNT I (ALL DEFENDANTS)
**(Negligence—Supervision of Procurement Department, Accounting and Financial Mismanagement)**

The ACC alleges, in part:

Each of the Defendants owed LTV Steel a duty to exercise due care to provide, or cause to be provided, competent financial management and leadership, competent

---

**3.** For the sake of brevity, the Court has set forth the pertinent allegations of the ACC's

accounting systems, and competent control and supervision of the Accounting Department and Procurement Department. Defendants breached their duties of due care in that regard by, among other things:

- failing to provide competent accounting services;
- failing to exercise sufficient control and proper supervision of LTV Steel's internal Accounting Department;
- failing to provide competent financial management and leadership; and
- failing to exercise sufficient and proper control over, failing to inform, and failing to supervise LTV Steel's Procurement Department and purchasing agents, allowing them to continue to incur substantial trade debt on behalf of LTV Steel from at least August through December 2001.

### Negligent Accounting and Supervision of Accounting Department.

For the period prior to September 4, 2001, as a proximate result of Defendants' failure to provide or arrange for competent accounting services and failure to exercise sufficient and proper control over LTV Steel's accounting department and financial management and leadership, Defendants allowed financial reporting functions to continue in a substandard and deficient manner, and took actions based on financial reports that they knew, or should have known, were unreliable. Defendants' acts and omissions constitute negligent mismanagement of the LTV Steel's business, negligent accounting, and negligent financial management and a violation of Defendants' duties of due care to the Debtor. As a direct and proximate result of Defendants' negligence and imprudent activities, the Defendants caused significant losses to LTV Steel and its bankruptcy estate.

proposed complaint. Claims which are similar are analyzed thereafter as required under

### Negligent Supervision of Procurement Department and Purchasing Agents

Despite having a duty to do so, Defendants failed to inform the purchasing agents (who dealt directly with LTV's vendors) of LTV Steel's cash crisis and inability to pay its creditors. Only a few high level executives in LTV Steel's corporate procurement department were told of the company's "severe liquidity crisis" in the Fall of 2001. As a result, lower level purchasing agents were not adequately controlled by the corporate procurement department, and their activities in pursuing goods and services on credit proceeded unchecked at all relevant times. Defendants were negligent in supervising LTV Steel's procurement department, by failing to inform the purchasing agents of the cash crisis, and by allowing LTV Steel's purchasing agents to continue to induce and obtain increased trade credit during the Fall of 2001, even up to the day the APP motion was filed on November 20, 2001. By September of 2001 or earlier, the Defendants knew, or should have known, that the postpetition debts of LTV Steel could not, and would not, be paid in full. Notwithstanding LTV Steel's liquidity crisis, Defendants failed to exercise sufficient control and direction over the actions of LTV Steel's plant level purchasing agents in order to prevent the incurrence of additional debt which Defendants knew, or should have known, could not be paid.

### COUNT II (ALL DEFENDANTS)

### (Gross Negligence/Reckless Disregard/Bad Faith—Supervision of Procurement Department, Accounting and Financial Mismanagement)

The ACC alleges in pertinent part that each of the Defendants owed LTV Steel a

the *Gibson*

duty to exercise due care to provide competent financial management and leadership, competent accounting systems, and competent control and supervision of the Accounting Department and Procurement Department. That Defendants' acts and omissions as herein alleged amounted to gross negligence, bad faith and/or reckless disregard for LTV Steel and its constituents by, among other things, those allegations set forth in Count I.

For the period prior to September 4, 2001, as a proximate result of Defendants' gross negligence, bad faith and/or reckless disregard for LTV Steel, based upon their failure to provide competent accounting services and failure to exercise sufficient and proper control over LTV Steel's accounting department, financial management and leadership, Defendants allowed financial reporting functions to continue in a substandard and deficient manner, and took actions based on financial reports that the Defendants knew, or should have known, were unreliable. Defendants' acts and omissions were committed with gross negligence, bad faith and/or reckless disregard of the well-being of LTV Steel and its constituents, and of Defendants' duties to LTV Steel and its constituents and with the intent to induce unknowing creditors to continue to extend credit to LTV Steel.

As a direct and proximate result of Defendants' gross negligence, bad faith and reckless disregard as alleged herein, LTV Steel has engaged in imprudent activities, all of which have caused significant losses to the Debtor and to its estate. As a result of Defendants' gross negligence, bad faith and/or reckless disregard of the supervision of LTV Steel's internal accounting department, Procurement Department and purchasing agents, Defendants caused LTV Steel to incur substantial unpaid trade debt and other debt estimated at over $100 Million. By reason of Defen-

dants' gross negligence, bad faith and/or reckless disregard with respect to the foregoing, the Debtor's estate is entitled to recovery of actual, compensatory and consequential damages from Defendants, jointly and severally, in an amount estimated to exceed $100 Million.

## COUNT III (ALL DEFENDANTS)
### (Breach of Fiduciary Duty of Due Care—Negligence)

The ACC alleges in pertinent part that:

Each of the Defendants owed the Debtor fiduciary duties of due care, including, but not limited to, (a) supervision and monitoring of the corporate affairs including its employees, officers, and information gathering system, (b) to act in good faith, (c) to act in a manner which was in the best interests of the Debtor, and (d) to act with such care, including reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under similar circumstances. It further alleges that Defendants breached their fiduciary duties to LTV Steel, by, among other things, negligently:

- Accelerating and paying, or permitting to be accelerated and paid, Bricker's "retention" bonus and salary;
- Operating or supervising the accounting and financial system of LTV Steel and reporting of LTV Steel's financial affairs to the detriment of LTV Steel;
- Concealing or misstating LTV Steel's true financial condition, allowing it to thereby deepen its insolvency, causing damage to the Debtor's estate and to its creditors;
- Directing or allowing the transfer of LTV Steel's assets or inventory to Copperweld, causing damage to the Debtor's estate;
- Failing to properly supervise, monitor or manage the accounting, financial, and procurement departments and affairs of

the Debtor, deepening its insolvency, and causing damage to the Debtor's estate;

● Failing to properly or timely assess, manage or report LTV Corp.'s and LTV Steel's liquidity problems,

● Allowing continued operations beyond the time when there was a reasonable chance of a successful reorganization, which caused waste of assets and erosion of the value of the company,

● Doing so to preserve the compensation and perquisites of existing management, rather than investigating or pursuing offers which might require a "change of control,"

● Authorizing compensation agreements with Bricker and Turner which contained inappropriate terms and conditions,

● Failing to conduct the affairs of LTV Steel and its bankruptcy estate as a separate entity from LTV Corp., or other afflicted entities,

● Authorizing or allowing the Copperweld estate to be favored at the expense of LTV Steel's estate,

● Authorizing or allowing the Copperweld estate to be favored at the expense of LTV Steel's estate in furtherance of self-dealing strategies being pursued by Bricker and Turner,

● Failing to maintain necessary liquidity;

● Appointing or retaining Bricker as the Chairman, President and CEO of LTV Steel;

● Appointing or retaining Turner as the Chief Operating Officer of LTV Steel,

● Authorizing large bonus payments to Bricker that were not conditioned on success in reorganizing LTV Steel;

● Authorizing and relying upon Bricker and Turner to negotiate with the USWA;

● Incurring unsecured, post-petition obligations at a time when they knew or should have known that LTV Steel would not be able to meet those obligations; and

● Failure to supervise the officers and managers who were directly responsible for the failures and errors described above, as well as those who performed the following functions:

● Preparation of financial reports used by management,

● Managing the cash flow and liquidity of LTV Steel,

● Managing the accounts payable of LTV Steel, and

● Managing the purchasing and procurement done by LTV Steel.

## COUNT IV (ALL DEFENDANTS)
## (Breach of Fiduciary Duty of Due Care—Gross Negligence/Bad Faith/Reckless Disregard)

The ACC alleges in pertinent part that:

By engaging in the acts or omissions described herein, each of the Defendants individually and/or jointly committed one or more acts, or omissions to act, with gross negligence, bad faith and/or reckless disregard in or for the conduct of the Debtor's business, which acts or omissions constituted a breach of his or her fiduciary duties of due care. As to each of the Defendants, their breaches of fiduciary duties fell substantially below the standards generally practiced and accepted by other fiduciaries in similar circumstances, and Defendants knew or had reason to know that their gross negligence, bad faith and/or reckless disregard created a substantial risk of harm to the estate of the Debtor. Given their positions of control and authority over LTV Steel and its debtor affiliates, Defendants were able to, and did, directly or indirectly control the con-

duct of the Debtor's operations and activities. Accordingly, each defendant is liable as a direct participant in, as a conspirator in connection with, and/or as an aider and abettor of the wrongs identified in this Complaint.

## A. NEGLIGENCE COUNTS ANALYSIS (Counts I, II, III, and IV)

■ Debtors object to the ACC's proposed relief on the basis that the business judgment rule overcomes claims of simple negligence. The business judgment rule is a rebuttable presumption that the directors of a company have acted in good faith and in the best interests of a company. *Omnicare, Inc. v. NCS Healthcare, Inc.*, 818 A.2d 914, 927–28 (Del.2003). The business judgment rule exempts directors from liability for decisions made in good faith.

■ If the director takes certain minimal steps, such as being informed about the background of a transaction, the rule protects a director from being held liable for the consequences of his or her actions. It does not protect a director who has permitted a transaction by purposefully or negligently staying uninformed about it. *Smith v. Van Gorkom*, 488 A.2d 858 (Del.Supr.1985). The business judgment rule also does not apply when the director has a conflict of interest. Nor does the rule protect a director when fraudulent, illegal, or reckless decisions are made.

Some courts have applied "enhanced scrutiny" when there is a possibility of a conflict of interest, rather than an actual presence of bad faith. Further, the Delaware Supreme Court has held that, when enhanced scrutiny is applied to directors' conduct, "a determination that the director defendants are exculpated from paying monetary damages by an exculpation provision in the company charter can be made

only after the basis for their liability has been decided."

■ The business judgment rule acts to protect from liability directors of a corporation acting in good faith. *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 954 (Del.Supr.1985). To be protected under the business judgment doctrine it must be determined that the parties acted in good faith. *See Amoco Oil Co. v. Ervin*, 908 P.2d 493 (Colo.1995). *Smith ex rel. Estates of Boston Chicken, Inc. v. Arthur Andersen L.L.P.*, 175 F.Supp.2d 1180, 1203–1204 (D.Ariz.2001).

■ As the Supreme Court of Delaware recently reaffirmed, where a board initiates an active bidding process, such as that which occurred throughout the LTV Steel bankruptcy case, so-called *Revlon* duties are triggered, and the deferential standards of the business judgment rule do not apply. *Omnicare, Inc. v. NCS Healthcare, Inc.*, 818 A.2d 914, 928–31 (Del.2003) ("there are certain circumstances, however, which mandate that a court take a more direct and active role in overseeing the decisions made and actions taken by directors. In these situations, a court subjects the directors' conduct to enhanced scrutiny to ensure that it is reasonable before the protections of the business judgment rule may be conferred"). Enhanced scrutiny involves (i) a judicial determination of the adequacy of the decision-making process employed; and (ii) a judicial examination of the reasonableness of the actions taken. *Id.* at 931.

Thusly, under the *Gibson* standards, Counts I, II, III, and IV meet the requirements of a colorable claim. It is undisputed that the ACC made a request of LTV to bring a derivative action regarding the initiation or prosecution of an action. It is further undisputed that the Debtors refused to bring such an action. If the ACC brings the proposed action, there is a ben-

efit to the estate that outweighs the cost to the estate.

## COUNT V (ALL DEFENDANTS EXCEPT FOR MORAN)

### (Breach of Fiduciary Duty of Due Care—Intentional Conduct)

The ACC alleges in pertinent part that:

As to each of the Defendants, their breaches of fiduciary duties fell substantially below the standards generally practiced and accepted by other fiduciaries in similar circumstances, and each of the Defendants, knew or had reason to know that their intentional acts or omissions to act created a substantial risk of harm to the estate of the Debtor. Given their positions of control and authority over LTV Steel and its debtor affiliates, Defendants were able to, and did, directly or indirectly control the conduct of the Debtor's operations and activities. Accordingly, each defendant is liable as a direct participant in, as a conspirator in connection with, and/or as an aider and abettor of the wrongs identified in this Complaint.

## COUNT VI (ALL DEFENDANTS)

### (Breach of Fiduciary Duty of Loyalty–Negligence)

The ACC alleges in pertinent part that:

Defendants owed the Debtor fiduciary duties of due care and loyalty, including, but not limited to, (a) supervision and monitoring the corporate affairs including its employees, officers, and information gathering system, (b) to act in good faith, (c) to act in a manner which was in the best interests of the Debtor, and (d) to act with such care, including reasonable inquiry, skill and diligence as a person of ordinary prudence would use under similar circumstances.

It further alleges that Defendants breached their fiduciary duty of loyalty to LTV Steel, by, among other things, negligently:

● Accelerating and paying, or permitting to be accelerated and paid, Bricker's "retention" bonus and salary;

● Operating or supervising the accounting and financial system of LTV Steel and reporting of LTV Steel's financial affairs to the detriment of LTV Steel;

● Concealing or misstating LTV Steel's true financial condition, allowing it to thereby deepen its insolvency, causing damage to the Debtor's estate and to its creditors;

● Directing or allowing the transfer of LTV Steel's assets or inventory to Copperweld, causing damage to the Debtor's estate;

● Failing to properly supervise, monitor or manage the accounting, financial, and procurement departments and affairs of the Debtor, deepening its insolvency, and causing damage to the Debtor's estate;

● Failing to properly or timely assess, manage or report LTV Corp.'s and LTV Steel's liquidity problems,

● Allowing continued operations beyond the time when there was a reasonable chance of a successful reorganization, which caused waste of assets and erosion of the value of the company,

● Doing so to preserve the compensation and perquisites of existing management, rather than investigating or pursuing offers which might require a "change of control,"

● Authorizing compensation agreements with Bricker and Turner which contained inappropriate terms and conditions,

● Failing to conduct the affairs of LTV Steel and its bankruptcy estate as a separate entity from LTV Corp., or other afflicted entities,

- Authorizing or allowing the Copperweld estate to be favored at the expense of LTV Steel's estate,
- Authorizing or allowing the Copperweld estate to be favored at the expense of LTV Steel's estate in furtherance of self-dealing strategies being pursued by Bricker and Turner,
- Failing to maintain necessary liquidity;
- Appointing or retaining Bricker as the Chairman, President and CEO of LTV Steel;
- Appointing or retaining Turner as the Chief Operating Officer of LTV Steel,
- Authorizing large bonus payments to Bricker that were not conditioned on success in reorganizing LTV Steel;
- Authorizing and relying upon Bricker and Turner to negotiate with the USWA;
- Incurring unsecured, post-petition obligations at a time when they knew or should have known that LTV Steel would not be able to meet those obligations; and
- Failure to supervise the officers and managers who were directly responsible for the failures and errors described above, as well as those who performed the following functions:
- Preparation of financial reports used by management,
- Managing the cash flow and liquidity of LTV Steel,
- Managing the accounts payable of LTV Steel, and
- Managing the purchasing and procurement done by LTV Steel.

## COUNT VII (ALL DEFENDANTS)

**(Breach of Fiduciary Duty of Loyalty–Gross Negligence/Bad Faith/Reckless Disregard)**

Defendants owed the Debtor fiduciary duties of due care and loyalty, including, but not limited to, (a) to supervise and monitor the corporate affairs including its employees, officers, and information gathering system, (b) to act in good faith, (c) to act in a manner which was in the best interests of the Debtor, and (d) to act with such care, including reasonable inquiry, skill and diligence as a person of ordinary prudence would use under similar circumstances.

Defendants knew, or should have known, that the Debtor was in the zone of insolvency and/or insolvent, or incapable of successfully reorganizing, at the time of the actions, inaction, and/or misconduct as alleged herein. The actions taken by Defendants, and each of them, with respect to the course of the conduct set out herein, violated these duties. Defendants breached their fiduciary duty of loyalty to the Debtor, LTV Steel, by, among other things, engaging in the following grossly negligent, bad faith and/or reckless conduct or omissions:

## COUNT VIII (ALL DEFENDANTS EXCEPT MORAN)

**(Breach of Fiduciary Duty of Loyalty–Intentional Conduct)**

The ACC alleges that:

Defendants owed the Debtor fiduciary duties of due care, including, but not limited to, (a) supervision and monitoring the corporate affairs including its employees, officers, and information gathering system, (b) to act in good faith, (c) to act in a manner which was in the best interests of the Debtor, and (d) to act with such care, including reasonable inquiry, skill and diligence as a person of ordinary prudence would use under similar circumstances. Defendants knew, or should have known, that the Debtor was in the zone of insolvency and/or insolvent or incapable of successfully reorganizing at the time of the actions, inaction, and/or misconduct as al-

leged herein. The actions taken by Defendants, and each of them, with respect to the course of the conduct set out herein, violated these duties.

Bricker and Turner further abused their positions of trust and loyalty, misused their superior knowledge of confidential and insider information, and manipulated the assets of Copperweld and LTV Steel for their own self-interests, personal profit and gain, and to the detriment of LTV Steel. Defendants intentionally breached their fiduciary duty of loyalty to the Debtor, LTV Steel, by, the same alleged conduct as stated in Count VI, above.

## B. DUTY OF LOYALTY CLAIMS ANALYSIS (Counts VI, VII, VIII)

 The Court finds that the ACC has alleged colorable claims pertaining to allegations that officers and directors breach their duty of loyalty (Counts VI, VII, and VIII). Section 102(b)(7) of the Delaware General Corporation Law allows a corporation's shareholders to exculpate directors for breaches of the duty of due care, though it does not allow limitation of liability for (i) breaches of the duty of loyalty, (ii) acts or omissions not in good faith or which involve intentional misconduct or knowing violations of the law, or (iii) any transaction from which the director derives an improper personal benefit. Del.Code Ann. tit. 8 § 102(b)(7); *see also In re New Valley Corp. Deriv.*, No. 17649, 2001 WL 50212, at *8, 2001 Del. Ch. LEXIS 13, at *27–28 (Del. Ch. New Castle Jan. 11, 2001); *see also In re Walt Disney Co. Derivative Litig.*, 825 A.2d 275, 290 (Del.Ch.2003).

 By its terms, the statute's exculpation language does not apply to *officers* of Delaware corporations. *Pereira v. Cogan*, 294 B.R. 449, 534 (S.D.N.Y.2003). Therefore, to the extent that the ACC complains of the conduct of LTV Corpora-

tion's (a Delaware company) officers, the exculpation clause allegedly contained in LTV Corporation's charter does not bar potential liability. Likewise, New Jersey's equivalent statute does allow exculpation of officers for duty of due care violations. *See* N.J. Stat. Ann. § 14A: 2–7(3) (2004). It is, however, subject to the same exceptions found in Delaware's statute. *Id.; see also In re PSE & G Shareholder Litig.*, 173 N.J. 258, 801 A.2d 295, 319 (2002).

Accordingly, under the *Gibson* standard, as mentioned prongs 1 and 2 have been satisfied to all counts herein. Under prong 3, Counts VI, VII, and VIII present colorable claims in accordance with the *Gibson* standards. If the proposed allegations are proven at trial, the potential benefit to the estate outweighs the cost that must be borne by the estate. Prong 4 is further established by the unjustified refusal of the board of directors to bring an action on the estate's behalf.

## COUNT IX (ALL DEFENDANTS)

## (Aiding, Abetting, Inducing or Participating in a Negligent Breach of Fiduciary Duty)

The ACC next alleges that:

Defendants negligently aided, abetted, induced or participated in the breaches of fiduciary duties by the other directors and officers of LTV Steel, causing harm to the estate of LTV Steel and to its creditors. As a direct and proximate result of Defendants' breaches of their fiduciary duties, the Debtor was caused to engage in imprudent activities, all of which have caused significant losses to the Debtor and to its estate.

## COUNT X (ALL DEFENDANTS)

## (Aiding, Abetting, Inducing or Participating in an Intentional Breach of Fiduciary Duty)

The ACC also alleges that:

Defendants knowingly aided, abetted, induced or participated in the breaches of fiduciary duties by the directors and officers of LTV Steel, causing harm to the estate of LTV Steel and to its creditors. As a direct and proximate result of Defendants' breaches of their fiduciary duties, the Debtor was caused to engage in imprudent and/or improper activities, all of which have caused significant losses to the Debtor and to its estate.

## C. AIDING AND ABETTING CLAIMS ANALYSIS (Counts IX and X)

Under applicable New Jersey law, courts apply the Restatement of Torts discussing aiding and abetting the conduct of others:

For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he

(a) does a tortious act in concert with the other or pursuant to a common design with him, or

(b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or

(c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

REST 2d TORTS § 876. The Comment to Clause (a) provides:

Parties are acting in concert when they act in accordance with an agreement to cooperate in a particular line of conduct or to accomplish a particular result. The agreement need not be expressed in words and may be implied and understood to exist from the conduct itself. Whenever two or more persons commit tortious acts in concert, each becomes subject to liability for the acts of the others, as well as for his own acts. The theory of the early common law was that

there was a mutual agency of each to act for the others, which made all liable for the tortious acts of

REST 2d TORTS § 876.

It is well established that the failure to act when one has a fiduciary duty to do so is sufficient to give rise to liability. *Francis v. United Jersey Bank,* 87 N.J. 15, 432 A.2d 814, 824–28 (1981). Whether or not the defendant's failure is intentional, reckless, grossly negligent, or negligent is immaterial. *See Id.* The burden of proving an aiding and abetting charge is by a standard. In order to establish liability for aiding and abetting a securities violation, the plaintiff has the burden of proving: "(1) that there has been a commission of a wrongful act an underlying securities violation; (2) that the alleged aider-abettor had knowledge of that act; and (3) that the aider-abettor knowingly and substantially participated in the wrongdoing." *First Pennsylvania Bank N.A. v. Monsen,* 439 U.S. 930, 99 S.Ct. 318, 58 L.Ed.2d 323 (1978); *Keller v. Coyle,* 499 F.Supp. 1031, 1033 (E.D.Pa. 1980); *Staffin v. Greenberg,* 509 F.Supp. 825, 833–834 (D.C.Pa., 1981). The proposed allegations as set forth in these counts are therefore colorable claims. Thus, the ACC has presented colorable claims in complaint Counts IX and X.

## COUNT XI (ALL DEFENDANTS EXCEPT MORAN)

### (Constructive Fraud)

The ACC further alleges that:

By virtue of their positions as directors and/or officers of LTV Steel, LTV Corp. and/or Copperweld, a confidential and special relationship existed at all times between Defendants and LTV Steel. Defendants had superior knowledge of LTV Steel's insolvency, looming cash crisis, severe and unrelenting liquidity problems,

and inability to pay creditors, and knew that such information was not readily available to the Debtor's creditors and vendors. Despite having voluntarily accepted the trust and confidence of LTV Steel by accepting the management and operations of LTV Steel, including all business and financial decisions, Defendants, in violation of this relationship of trust and confidence, abused the trust and confidence of LTV Steel, its creditors and vendors as alleged herein.

LTV Steel, its creditors and vendors reasonably relied on Defendants in view of their special financial, business and management expertise, as well as their fiduciary relationship with LTV Steel. LTV Steel, its creditors and vendors placed their trust and confidence in Defendants, until Plaintiff later discovered the grave deficiencies, errors, acts and omissions, concerning the management and operation of LTV Steel as alleged herein.

Defendants performed the acts or failed to act as alleged herein with the intent to deceive and defraud LTV Steel, its creditors and vendors, and concealed the true facts from LTV Steel, its creditors and vendors. Defendants performed these fraudulent acts with the intent to induce reliance by LTV Steel, its creditors and vendors and to cause LTV Steel, its creditors and vendors to act as alleged herein.

LTV Steel, its creditors and vendors justifiably relied on Defendants' non-disclosures, concealments, misstatements, and/or misrepresentations to their detriment, by continuing to extend trade credit to the Debtor at a time that Defendants knew that the Debtor would never be able to pay said creditors and vendors or successfully emerge from the bankruptcy.

Defendants' constructive fraud caused damage to LTV Steel, its creditors and vendors by deepening the insolvency of the Debtor and causing damage to the Debt-

or's estate in an amount estimated to exceed $100 Million.

## COUNT XII (ALL DEFENDANTS EXCEPT MORAN)

### (Aiding and Abetting Constructive Fraud)

The ACC alleges that:

Defendants aided and abetted each of the other Defendants in the constructive fraud perpetrated on LTV Steel, its creditors and vendors thereby causing damage to LTV Steel by deepening the insolvency of the Debtor and causing damage to the Debtor's estate in an amount estimated to exceed $100 Million. Because the acts and conduct of Defendants were intentional, willful, wanton, malicious, and without justification or excuse, the Debtor's estate is also entitled to punitive damages in an amount to be determined by the trier of fact.

## COUNT XIII (ALL DEFENDANTS)

### (Negligent Misrepresentation)

The ACC alleges that:

Defendants negligently made, or allowed to be made, misrepresentations to LTV Steel, its creditors and vendors to induce them to extend further trade credit and to sell inventory and products to LTV Steel on credit. LTV Steel, its creditors and vendors were unaware and ignorant of the fact that Defendants' representations and/or public pronouncements regarding LTV Steel's true financial condition were false and instead reasonably believed them to be true. LTV Steel, its creditors and vendors relied on Defendants' representations and based upon that reliance LTV Steel continued to incur additional trade debt and its creditors and vendors to extend trade credit from at least August through December 2001. LTV Steel's, its creditors' and vendors' reliance upon Defendants' representations were reasonable

in that Defendants were the officers and directors of LTV Steel and LTV Corp. and LTV Steel, its creditors and vendors had no reason to disbelieve or distrust the officers and directors of these entities with whom they had engaged in business for many years and had placed their trust and confidence. LTV Steel, its creditors and vendors were not aware of any other circumstance that should have caused suspicion in the mind of a reasonable person as to the truthfulness or accuracy of Defendants' representations.

Had LTV Steel, its creditors and vendors known the true facts and Defendants' actual intentions, LTV Steel would not have incurred further trade debt and the creditors and vendors would not have extended further trade credit on behalf of LTV Steel. Defendants made the representations alleged herein, including representations about LTV Steel's ability to successfully restructure and repay creditors, with the intent that LTV Steel, its creditors and vendors act in reliance on such representations. LTV Steel's, its creditors and vendors' reliance upon Defendants' misrepresentations was justified as they had no reason to disbelieve or distrust the representations and promises made by Defendants.

## NEGLIGENT MISREPRESENTATION ANALYSIS (Count XIII)

 Negligent misrepresentation requires: 1) a particular duty to provide accurate information, based on the plaintiffs pecuniary interest in that information; 2) the supplying of false information; 3) failure to exercise reasonable care in obtaining or communicating information; and 4) a pecuniary loss caused by justifiable reliance on the false information. *H–M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 147 (Del.Ch.2003). The Court finds that the ACC has alleged colorable claims pertaining to allegations of negligent mis-

representation pursuant to the *Gibson* standard. Again, it is undisputed that the ACC made a request of LTV to bring a derivative action regarding the initiation or prosecution of an action. It is further undisputed that the Debtors refused to bring such an action. If the ACC brings the proposed action, including the negligent misrepresentation claim, there is a benefit to the estate that outweighs the cost to the estate. Likewise, the refusal of the board of directors to bring an action on the estate's behalf was unjustified.

## COUNT XIV (ALL DEFENDANTS EXCEPT MORAN)

### (Fraud)

The ACC further alleges:

Defendants made false representations to LTV Steel, its creditors and vendors to induce creditors and vendors to extend further trade credit. At all times herein, LTV Steel, its creditors and vendors were unaware and ignorant of the fact that Defendants' representations and public pronouncements were false and fraudulent and instead reasonably believed them to be true. LTV Steel, its creditors and vendors relied on Defendants' representations and based upon that reliance LTV Steel continued to incur additional trade debt and LTV Steel's creditors and vendors extended trade credit from at least August through December 2001. LTV Steel's, its creditors' and vendors' reliance upon Defendants' representations were reasonable in that Defendants were the officers and directors of LTV Steel and LTV Corp. and LTV Steel, its creditors and vendors had no reason to disbelieve or distrust the officers and directors of these entities with whom they had engaged in business for many years and had placed their trust and confidence. LTV Steel, its creditors and vendors were not aware of any other circumstance that should have caused suspi-

cion in the mind of a reasonable person as to the truthfulness or accuracy of Defendants' representations.

## COUNT XV (ALL DEFENDANTS EXCEPT MORAN)

### (Conspiracy to Defraud)

The ACC also alleges that:

Defendants knowingly and willfully conspired and agreed amongst themselves to deprive LTV Steel of the property belonging to it, to defraud LTV Steel as alleged herein, and to loot assets belonging to LTV Steel. Defendants acted or failed to act as alleged herein pursuant to, and in furtherance of, the conspiracy. Defendant officers and directors furthered the conspiracy by soliciting the cooperation of the other Defendant officers and directors who participated in the acts of their codefendants through the cooperation, aid, encouragement, ratification and adoption of all the acts of co-defendants as alleged herein.

## E. FRAUD CLAIMS ANALYSIS
### (Counts XII, XIV, and XV)

■■■■■ Debtors and Moran object to causes of action for fraud contending that the claims do not do not provide specificity as required under the Federal Rules. Rule 9(b) of the Federal Rules of Civil Procedure, which applies to bankruptcy proceedings pursuant to Bankruptcy Rule 7009, provides that "[i]n all averments of fraud ... the circumstances constituting fraud ... shall be stated with particularity." Fed. R. Bankr.P. 7009; Fed.R.Civ.P. 9(b). The purpose of the rule is to provide defendants with fair notice of the substance of a plaintiff's claim in order that a defendant may adequately prepare a responsive pleading. *Michaels Bldg. Co. v. Ameritrust Co., N.A.,* 848 F.2d 674, 679 (6th Cir.1988).

■■■■■ While the purpose of Rule 9(b) is to provide detailed notice of the circumstances constituting fraud, each and every alleged misrepresentation need not appear in the pleadings. 2 *Moore's Federal Practice* § 9.03[1][a]. A claimant is only required to set forth the major misrepresentations or omissions upon which the fraud claims are based. A claimant is not required to explain the legal theory of the fraud claim. *See Midwest Commerce Banking Co. v. Elkhart City Centre,* 4 F.3d 521, 523 (7th Cir.1993); *Smith ex rel. Estates of Boston Chicken, Inc. v. Arthur Andersen L.L.P.,* 175 F.Supp.2d 1180, 1201 (D.Ariz.2001).

■■■■■ The requirements of particularity under Rule 9(b) vary with each case. *See Shushany v. Allwaste,* 992 F.2d 517, 521 (5th Cir.1993). Furthermore, a more liberal standard for pleading fraud with particularity is applied in bankruptcy cases. *See In re O.P.M. Leasing Services,* 35 B.R. 854, 862 (Bkrtcy.S.D.N.Y.1983), *rev'd in part on other grounds, In re O.P.M. Leasing Services,* · 48 B.R. 824 (S.D.N.Y.1985).

This less stringent standard is predicated upon the fact that it is often the trustee, a third party, who is pleading fraud based on second-hand information. *See id.; see also Schlick v. Penn–Dixie Cement Corp.,* 507 F.2d 374, 379 (2nd Cir.1974); *In re Germain,* 144 F.Supp. 678, 683 (S.D.Cal. 1956). *See General Electric Capital Corp. v. Lease Resolution Corporation,* 128 F.3d 1074, 1080 (7th Cir.1997) (Rule 9(b) satisfied when plaintiff alleged a transfer of assets, without receipt of reasonably equivalent value, which rendered the transferee insolvent); *see also In re O.P.M. Leasing,* 35 B.R. at 862 (Rule 9(b) satisfied when the trustee alleges fraudulent conveyances between certain years for a total sum certain and that these transactions occurred without the provision of fair consideration). *Smith ex rel. Estates of Boston Chicken, Inc. v. Arthur Andersen L.L.P.,* 175 at 1202.

Moran's objection is hereby overruled on the basis that he is not included as a defendant in the aforementioned proposed allegations. The Debtors limited objection is overruled for the reasons stated above. It is undisputed that the ACC made a request of LTV to bring a derivative action regarding the initiation or prosecution of an action If the ACC brings the proposed action, there is a benefit to the estate that outweighs the cost to the estate. Lastly, the refusal to bring the action was unjustified.

Accordingly, a colorable claim exists under the *Gibson* standard with respect to Counts XII, XIV, and XV.

## DEEPENING INSOLVENCY COUNTS

### COUNT XVI (ALL DEFENDANTS EXCEPT MORAN)

#### (Deepening Insolvency—Intentional)

The ACC alleges that:

Defendants intentionally and fraudulently prolonged LTV Steel's life through the intentional concealment of LTV Steel's true financial condition, through misstatements and misrepresentations, and through the wrongful manipulation of LTV Steel's financial affairs. Defendants' wrongful conduct and concealment of LTV Steel's true financial condition which contributed to its deepening insolvency included but is not limited to:

- Accelerating and paying, or permitting to be accelerated and paid, Bricker's "retention" bonus and salary;
- Operating or supervising the accounting and financial system of LTV Steel and reporting of LTV Steel's financial affairs to the detriment of LTV Steel;
- Concealing or misstating LTV Steel's true financial condition, allowing it to thereby deepen its insolvency, causing damage to the Debtor's estate and to its creditors;

- Directing or allowing the transfer of LTV Steel's assets or inventory to Copperweld, causing damage to the Debtor's estate;
- Failing to properly supervise, monitor or manage the accounting, financial, and procurement departments and affairs of the Debtor, deepening its insolvency, and causing damage to the Debtor's estate;
- Failing to properly or timely assess, manage or report LTV Corp.'s and LTV Steel's liquidity problems,
- Allowing continued operations beyond the time when there was a reasonable chance of a successful reorganization, which caused waste of assets and erosion of the value of the company,
- Doing so to preserve the compensation and perquisites of existing management, rather than investigating or pursuing offers which might require a "change of control,"
- Directing or allowing transfers of steel inventory from LTV Steel to Copperweld in the manner and amounts specified herein,
- Authorizing compensation agreements with Bricker and Turner which contained inappropriate terms and conditions,
- Authorizing or allowing the Copperweld estate to be favored at the expense of LTV Steel's estate in furtherance of self-dealing strategies being pursued by Bricker and Turner,
- Authorizing large bonus payments to Bricker that were not conditioned on success in reorganizing LTV Steel;
- Incurring unsecured, post-petition obligations at a time when they knew or should have known that LTV Steel would not be able to meet those obligations; and

- Failure to supervise the officers and managers who were directly responsible for the failures and errors described above, as well as those who performed the following functions:
- Preparation of financial reports used by management,
- Managing the cash flow and liquidity of LTV Steel,
- Managing the accounts payable of LTV Steel, and
- Managing the purchasing and procurement done by LTV Steel.

As a proximate result of the intentional and willful prolongation of the Debtor's existence, Defendants' actions caused the Debtor to sink deeper into insolvency by incurring additional liabilities that they knew would never be paid.

As a proximate result of the intentional and willful prolongation of the Debtor's existence and deepening insolvency, the value of the Debtor's business that could have been realized had the corporation's existence not been prolonged was lost, causing damage to the estate of the Debtor in an amount estimated to exceed $100 Million. As a proximate result of the failure to disclose LTV Steel's liquidity crisis and true financial condition to vendors and creditors from at least September through November of 2001, LTV Steel's insolvency was deepened, and it was caused to continue to incur spurious debt during a period when it was losing $1–2 Million per day and had no realistic prospects for survival.

## COUNT XVII (ALL DEFENDANTS)
### (Deepening Insolvency—Negligence)

The ACC alleges that:

Defendants negligently prolonged the Debtor's life through the negligent concealment of LTV Steel's true financial condition, through negligent misstatements about LTV Steel's financial condition, and through the negligent manipulation of its financial affairs. Defendants' negligent conduct and concealment of LTV Steel's true financial condition which contributed to its deepening insolvency included but is not limited to the same conduct alleged in Count XVII above.

## COUNT XVIII (ALL DEFENDANTS)
### (Deepening Insolvency—Gross Negligence/Bad Faith/Recklessness)

The ACC alleges that:

Defendants were grossly negligent and otherwise acted recklessly and/or in bad faith in artificially prolonging LTV Steel's life through the concealment of LTV Steel's true financial condition, through misstatements and misrepresentations, and through the wrongful manipulation of LTV Steel's financial affairs. Defendants' wrongful conduct and concealment of LTV Steel's true financial condition which contributed to its deepening insolvency included but is not limited to the same conduct alleged in Count XVI.

As a proximate result of the acts of the reckless, bad faith grossly negligent acts and omissions of the Defendants in the prolongation of the Debtor's existence, Defendants' actions caused the Debtor to sink deeper into insolvency by incurring additional liabilities that they knew or should have known would never be paid. As a proximate result of the acts of the reckless, bad faith grossly negligent acts and omissions of the Defendants in the prolongation of the Debtor's existence, the value of the Debtor's business that could have been realized had the corporation's existence not been prolonged was lost, causing damage to the estate of the Debtor in an amount estimated to exceed $100 Million.

As a proximate result of the failure to disclose LTV Steel's liquidity crisis and true financial condition to vendors and creditors from at least September through November of 2001, LTV Steel's insolvency

was deepened, and it was caused to continue to incur spurious debt during a period when it was losing $1–2 Million per day and had no realistic prospects for survival.

## COUNT XIX (ALL DEFENDANTS EXCEPT MORAN)

### (Deepening Insolvency—Intentional Stretching of Trade Payables)

The ACC alleges that as of August 2000, LTV Steel's trade payables were approximately $115 Million. By September 2001 or earlier, Defendants knew, or should have known, that LTV Steel faced a severe liquidity crisis. The immediate liquidity enhancement program ("ILEP") implemented on September 14, 2001, include among its goals an effort to defer expenditures, stretching LTV Steel's trade payables in the Fall of 2001, at a time when vendors should have been advised that LTV Steel could not pay them. Although LTV Steel scaled back operations, reduced inventory and stopped shipments of additional iron ore, its accounts payable level remained constant, indicative of a stretch of existing payables. As a proximate result of the intentional stretching of trade payables from September through November 2001, LTV Steel's accounts payable ballooned to $140–$150 Million. As a proximate result of the intentional stretching of trade payables at a time when the Debtor's inability to pay those sums was clear, Defendants' actions caused LTV Steel to sink deeper into insolvency by increasing the amount of trade payables by no less than $35 Million.

## COUNT XX (ALL DEFENDANTS)

### (Deepening Insolvency—Negligent Stretching of Trade Payables)

The ACC alleges that;

By September 2001 or earlier, Defendants knew, or should have known, that LTV Steel faced a severe liquidity crisis. The immediate liquidity enhancement program ("ILEP") implemented on September 14, 2001, included among its goals an effort to defer expenditures, stretching LTV Steel's trade payables in the Fall of 2001, at a time when vendors should have been advised that LTV Steel could not pay them. Although LTV Steel scaled back operations, reduced inventory and stopped shipments of additional iron ore, its accounts payable level remained constant, indicative of a stretch of existing payables. As a proximate result of the negligent stretching of trade payables from September through November 2001, LTV Steel's accounts payable ballooned to $140–$150 Million.

As a proximate result of the negligent stretching of trade payables at a time when Defendants should have known of the Debtor's inability to pay those sums, Defendants' actions caused LTV Steel to sink deeper into insolvency by increasing the amount of trade payables by no less than $35 Million, the amount of the increase in payables outstanding compared to LTV Steel's historic average, causing damage to the Debtor's estate.

## COUNT XXI (ALL DEFENDANTS)

### (Deepening Insolvency—Gross Negligence, Recklessness, Bad Faith)

The ACC further alleges that:

Defendants were grossly negligent, reckless and/or acted in bad faith in causing or allowing the Debtor's life to be prolonged through the concealment of LTV Steel's true financial condition, through misstatements about its financial condition, and through the manipulation of its financial affairs. Defendants' conduct and concealment of LTV Steel's true financial condition which contributed to its deepening insolvency included but is not limited to the same alleged conduct in Count XVI above.

As a proximate result of the grossly negligent, reckless and/or bad faith prolongation of the Debtor's existence, Defendants' actions caused the Debtor to sink deeper into insolvency by incurring additional liabilities that they should have known would never be paid. As a proximate result of the negligent prolongation of the Debtor's existence and deepening insolvency, the value of the Debtor's business that could have been realized had the corporation's existence not been prolonged was lost, causing damage to the estate of the Debtor in an amount estimated to exceed $100 Million.

## F. DEEPENING INSOLVENCY CLAIMS ANALYSIS (Proposed Counts XVII, XVIII, XIX, XX, and XXI).

 Debtors' limited objection and Moran's objection contend that their is no cause of action for "deepening insolvency". Historically, the "zone of insolvency" is a created concept created to account for a shifting and expanding of a board of directors' fiduciary duties when a company is entering a time of financial distress. Courts have held that fiduciary duties to creditors arise upon a corporation's "insolvency-in-fact," rather than when a party institutes formal bankruptcy proceedings. *See Geyer v. Ingersoll Publications Co.,* 621 A.2d 784, 787 (Del.Ch.1992). From a board's decision-making perspective, their fiduciary duties may have already expanded at the moment of insolvency in the time before the actual filing of bankruptcy.

 The concept of "deepening insolvency" is newly created as well. A defendant may be liable for "deepening insolvency" where the defendant's conduct, either fraudulently or even negligently, prolongs the life of a corporation thereby increasing the corporation's debt and exposure to creditors. Pennsylvania has joined the growing list of jurisdictions recognizing this doctrine. Accordingly, "deepening insolvency" should be understood both by plaintiffs attempting to use the doctrine and by defendants strenuously trying to avoid it. The Third Circuit in *Lafferty* opined:

> Under federal bankruptcy law, insolvency is a financial condition in which a corporation's debts exceed the fair market value of its assets. 11 U.S.C. § 101(32). Even when a corporation is insolvent, its corporate property may have value. The fraudulent and concealed incurrence of debt can damage that value in several ways. For example, to the extent that bankruptcy is not already a certainty, the incurrence of debt can force an insolvent corporation into bankruptcy, thus inflicting legal and administrative costs on the corporation. *See* Richard A. Brealey & Stewart C. Myers, *Principles of Corporate Finance* 487 (5th ed. 1996) ("[B]y issuing risky debt,[a corporation] give[s] lawyers and the court system a claim on the firm if it defaults."). When brought on by unwieldy debt, bankruptcy also creates operational limitations which hurt a corporation's ability to run its business in a profitable manner. *See id.* at 488–89. Aside from causing actual bankruptcy, deepening insolvency can undermine a corporation's relationships with its customers, suppliers, and employees. The very threat of bankruptcy, brought about through fraudulent debt, can shake the confidence of parties dealing with the corporation, calling into question its ability to perform, thereby damaging the corporation's assets, the value of which often depends on the performance of other parties. *See* Michael S. Knoll, *Taxing Prometheus: How the Corporate Interest Deduction Discourages Innovation and Risk–Taking,* 38 Vill. L.Rev. 1461, 1479–80 (1993). In

addition, prolonging an insolvent corporation's life through bad debt may simply cause the dissipation of corporate assets. These harms can be averted, and the value within an insolvent corporation salvaged, if the corporation is dissolved in a timely manner, rather than kept afloat with spurious debt. As the Seventh Circuit explained in *Schacht v. Brown:* [C]ases [that oppose "deepening insolvency"] rest[ ] upon a seriously flawed assumption, i.e., that the fraudulent prolongation of a corporation's life beyond insolvency is automatically to be considered a benefit to the corporation's interests. This premise collides with common sense, for *the corporate body is ineluctably damaged by the deepening of its insolvency, through increased exposure to creditor liability. Indeed, in most cases, it would be crucial that the insolvency of the corporation be disclosed, so that shareholders may exercise their right to dissolve the corporation in order to cut their losses.* Thus, acceptance of a rule which would bar a corporation from recovering damages due to the hiding of information concerning its insolvency would create perverse incentives for wrong-doing officers and directors to conceal the true financial condition of the corporation from the corporate body as long as possible. 711 F.2d 1343, 1350 (7th Cir.1983) (citations omitted) (emphasis added). *Official Committee of Unsecured Creditors v. R.F. Lafferty & Co., Inc.,* 267 F.3d 340, 349–350 (3rd Cir.2001). According to other applicable law, the potential harms to a debtor arising from its so-called deepening insolvency may include legal and administrative costs arising from bankruptcy, operational and revenue loss because of functional limitations brought on by bankruptcy status and the loss of good will with the corporation's customers, suppliers and employees.

The deepening insolvency theory of director and officer liability has received growing acceptance in recent years, particularly in federal courts. *See, e.g., Official Comm. Of Unsec. Creds. v. R.F. Lafferty & Co., Inc.,* 267 F.3d 340, 350 (3d Cir.2001); *Florida Dep't of Ins. v. Chase Bank of Texas Nat'l Ass'n,* 274 F.3d 924, 935 (5th Cir.2001); *Lichtenstein v. Stockton Bates, LLP (In re Computer Personalities Systems, Inc.),* No. 01–14231, 2003 WL 22844863 (Bankr.E.D.Pa. Nov.18, 2003); *Robertson v. White,* 633 F.Supp. 954, 960–78 (W.D.Ark.1986); *In re Gouiran Holdings, Inc.,* 165 B.R. 104, 106–08 (E.D.N.Y. 1994); *Official Comm. of Unsec. Creds. v. Credit Suisse First Boston (In re Exide Techs., Inc.),* 299 B.R. 732, 736 (Bankr. D.Del.2003); *Marwil v. Grubbs,* No. 1:03–cv–1165, 2004 WL 2278751, at *3, 5, 2004 U.S. Dist. LEXIS 20250, at *13, 18–19 (S.D.Ind., Sept. 30, 2004).

Courts have observed that deepening the insolvency of an already troubled company causes harm to the corporation by, among other things, (i) inflicting legal and administrative costs on the company and limiting the company's ability to operate its business in a profitable manner; (ii) undermining a company's relationships with its shareholders, suppliers, employees and others who do business with it and causing damage to corporate assets, the value of which LTV Steel is a New Jersey corporation. LTV Corporation is a Delaware Corporation. New Jersey and Delaware are each in the Third Circuit. Therefore, the *Lafferty* and *Exide Technologies* cases, decided by courts in the Third Circuit, and in which both the Third Circuit and the Delaware bankruptcy courts indicated their approval of deepening insolvency as a free-standing tort, arguably apply to the proposed lawsuit.

Again, it is undisputed that the ACC made a request of LTV to bring a deriva-

tive action regarding the initiation or prosecution of an action If the ACC brings the proposed action, there is a benefit to the estate that outweighs the cost to the estate. Lastly, the refusal to bring the action was unjustified.

## COUNT XXII (ALL DEFENDANTS)
### (Corporate Waste—Negligence)

The foregoing acts of the Defendants caused the misapplication and waste of LTV Steel's corporate assets to the financial loss and detriment of the Debtor's estate. Defendants' acts of negligence, as evidenced by their acts of imprudent and wasteful expenditures, and irresponsible deployment and use of corporate assets and debts, included, but are not limited to:

- Accelerating and paying, or permitting to be accelerated and paid, Bricker's "retention" bonus and salary;
- Operating or supervising the accounting and financial system of LTV Steel and reporting of LTV Steel's financial affairs to the detriment of LTV Steel;
- Concealing or misstating LTV Steel's true financial condition, allowing it to thereby deepen its insolvency, causing damage to the Debtor's estate and to its creditors;
- Directing or allowing the transfer of LTV Steel's assets or inventory to Copperweld, causing damage to the Debtor's estate;
- Failing to properly supervise, monitor or manage the accounting, financial, and procurement departments and affairs of the Debtor, deepening its insolvency, and causing damage to the Debtor's estate;
- Failing to properly or timely assess, manage or report LTV Corp.'s and LTV Steel's liquidity problems,
- Allowing continued operations beyond the time when there was a reasonable chance of a successful reorganization, which caused waste of assets and erosion of the value of the company,
- Doing so to preserve the compensation and perquisites of existing management, rather than investigating or pursuing offers which might require a "change of control,"
- Authorizing compensation agreements with Bricker and Turner which contained inappropriate terms and conditions,
- Failing to conduct the affairs of LTV Steel and its bankruptcy estate as a separate entity from LTV Corp., or other afflicted entities,
- Authorizing or allowing the Copperweld estate to be favored at the expense of LTV Steel's estate,
- Authorizing or allowing the Copperweld estate to be favored at the expense of LTV Steel's estate in furtherance of self-dealing strategies being pursued by Bricker and Turner,
- Failing to maintain necessary liquidity;
- Appointing or retaining Bricker as the Chairman, President and CEO of LTV Steel;
- Appointing or retaining Turner as the Chief Operating Officer of LTV Steel,
- Authorizing large bonus payments to Bricker that were not conditioned on success in reorganizing LTV Steel;
- Authorizing and relying upon Bricker and Turner to negotiate with the USWA;
- Incurring unsecured, post-petition obligations at a time when they knew or should have known that LTV Steel would not be able to meet those obligations; and
- Failure to supervise the officers and managers who were directly responsible for the failures and errors described above, as well as those who performed the following functions:

- Preparation of financial reports used by management,
- Managing the cash flow and liquidity of LTV Steel,
- Managing the accounts payable of LTV Steel, and
- Managing the purchasing and procurement done by LTV Steel.

These actions, the ACC argues, but were a direct and proximate cause of the Debtor's demise, and caused substantial injury to the Debtor's estate. As a proximate result of Defendants' waste of corporate funds, assets and resources, the Debtor's estate is entitled to recovery of actual, compensatory and consequential damages from Defendants, jointly and severally, in an amount that is not presently ascertained but is expected to exceed $100 Million.

## COUNT XXIII (ALL DEFENDANTS EXCEPT MORAN)[4]
### (Corporate Waste—Intentional)

The foregoing acts of the Defendants caused the misapplication and waste of LTV Steel's corporate assets to the financial loss and detriment of the Debtor's estate. Defendants' acts of gross negligence, reckless, and/or willful, and fraudulent misconduct as evidenced by their acts of self-dealing, looting, imprudent and wasteful expenditures, and irresponsible deployment and use of corporate assets and debts, included, but are not limited to the same actions set forth in Count XXII.

### CORPORATE WASTE ANALYSIS (Counts XXIII)

■■■■■ Corporate waste occurs when a corporation is caused to effect a transaction on terms that no person of ordinary, sound business judgment could conclude represent a fair exchange. Indeed the leading case employs language that is even stricter. According to that formulation the ACC must prove that no such person could even "entertain the view that [the transaction under attack] represented a fair exchange." *Saxe v. Brady,* 40 Del. Ch. 474, 184 A.2d 602 (1962). Thus, for liability to exist the defendants must have approved a transaction exchanging something of value for consideration so inadequate that "no person of ordinary, sound business judgment would deem it worth what the corporation has paid." *Id.; see also, Michelson v. Duncan,* 407 A.2d 211 (Del.Supr.1979). If under the circumstances any reasonable person might conclude that the deal made sense, then the judicial inquiry ends.

Courts have established that this is obviously an extreme test, very rarely satisfied by a shareholder plaintiff. The difficulty of this test does not reflect judicial laxity or sympathy, but rather reflects the law's understanding of what rules will help promote wealth creating activity. If courts were permitted more freely to "second guess" the terms of corporate contracts (on for example a "reasonableness" ground) there would be a substantial disincentive created for officers and directors (especially directors who generally receive no incentive compensation) to approve risky transactions. Yet the corporate form, with its limited liability and potential for investor diversification, has great utility in part because these characteristics encourage the assumption of economic risk. The very high hurdle that a shareholder must overcome if he seeks to impose liability on a theory of corporate waste is, thus, in fact a protection of one of the basic utilities that the corporate form

---

4. The complaint expressly provides that Glenn Moran is excepted from this proposed count allegation.

offers. *Steiner v. Meyerson,* 1995 WL 441999, 1 (Del.Ch.1995).

■ Therefore under the *Gibson* standard, as mentioned, prong 1 and 2 and 4 have been satisfied. Under prong 3, if the proposed allegations are proven, there will be a benefit to the estate. However, case law suggests that plaintiffs rarely meet the legal hurdles that must be met in challenging corporate waste. Although plaintiffs rarely meet such hurdles, it is not this Court's role, at this time, to consider whether the ACC can fully meet such a burden. The proposed claim is not without any legal merit whatsoever as contemplated by the definition of a colorable claim.

Accordingly, the propose counts meet the definition of a colorable claim.

## COUNT XXIV (ALL DEFENDANTS)

**(Breach of Fiduciary Duties to Creditors of LTV Steel)**

■ At all relevant and material times, LTV Steel was either insolvent or was operating in the vicinity of insolvency such that each of the Defendants owed fiduciary duties to LTV Steel's creditors. Defendants breached their fiduciary duties to LTV Steel's creditors, directly and proximately causing generalized harm to LTV Steel's creditors as a class in at least the following ways, among other things.:

- Accelerating and paying, or permitting to be accelerated and paid, Bricker's "retention" bonus and salary;
- Operating or supervising the accounting and financial system of LTV Steel and reporting of LTV Steel's financial affairs to the detriment of LTV Steel;
- Concealing or misstating LTV Steel's true financial condition, allowing it to thereby deepen its insolvency, causing damage to the Debtor's estate and to its creditors;
- Directing or allowing the transfer of LTV Steel's assets or inventory to Copperweld, causing damage to the Debtor's estate;
- Failing to properly supervise, monitor or manage the accounting, financial, and procurement departments and affairs of the Debtor, deepening its insolvency, and causing damage to the Debtor's estate;
- Failing to properly or timely assess, manage or report LTV Corp.'s and LTV Steel's liquidity problems,
- Allowing continued operations beyond the time when there was a reasonable chance of a successful reorganization, which caused waste of assets and erosion of the value of the company,
- Doing so to preserve the compensation and perquisites of existing management, rather than investigating or pursuing offers which might require a "change of control,"
- Authorizing compensation agreements with Bricker and Turner which contained inappropriate terms and conditions,
- Failing to conduct the affairs of LTV Steel and its bankruptcy estate as a separate entity from LTV Corp., or other afflicted entities,
- Authorizing or allowing the Copperweld estate to be favored at the expense of LTV Steel's estate,
- Authorizing or allowing the Copperweld estate to be favored at the expense of LTV Steel's estate in furtherance of self-dealing strategies being pursued by Bricker and Turner,
- Failing to maintain necessary liquidity;
- Appointing or retaining Bricker as the Chairman, President and CEO of LTV Steel;
- Appointing or retaining Turner as the Chief Operating Officer of LTV Steel,

- Authorizing large bonus payments to Bricker that were not conditioned on success in reorganizing LTV Steel;
- Authorizing and relying upon Bricker and Turner to negotiate with the USWA;
- Incurring unsecured, post-petition obligations at a time when they knew or should have known that LTV Steel would not be able to meet those obligations; and
- Failure to supervise the officers and managers who were directly responsible for the failures and errors described above, as well as those who performed the following functions:
- Preparation of financial reports used by management,
- Managing the cash flow and liquidity of LTV Steel,
- Managing the accounts payable of LTV Steel, and
- Managing the purchasing and procurement done by LTV Steel.

As a direct and proximate result of Defendants' breaches of fiduciary duty to LTV Steel's creditors, the ACC contends the Debtor's estate is entitled to recovery of actual compensatory and consequential damages from Defendants, jointly and severally, in an amount that is not presently ascertained but is expected to exceed $100 Million.

As previously set forth, Section 102(b)(7) of the Delaware General Corporation Law allows a corporation's shareholders to exculpate directors for breaches of the duty of due care, though it does not allow limitation of liability for (i) breaches of the duty of loyalty, (ii) acts or omissions not in good faith or which involve intentional misconduct or knowing violations of the law, or (iii) any transaction from which the director derives an improper personal benefit. Del.Code Ann. tit. 8 § 102(b)(7); *see*

*also In re Valley Corp. Deriv.,* No. 17649, 2001 WL 50212, at *8, 2001 Del. Ch. LEXIS 13, at *27–28 (Del. Ch. New Castle Jan. 11, 2001); *see also In re Walt Disney Co. Derivative Litig.,* 825 A.2d 275, 290 (Del. Ch.2003).

Furthermore, neither New Jersey law, nor Delaware law, shield persons from personal liability for actions or inactions taken or not taken in bad faith. Therefore, a colorable claim exists as to Count XXIV as *Gibson* has been satisfied as mentioned *infra.*

### DEBTOR'S LIMITED OBJECTION TO DOE DEFENDANTS

■ LTV Steel's Objection attempts to obtain a release for the directors and officers not specifically named in the proposed complaint by seeking to eliminate the defendants identified as "DOES 1–100" from the lawsuit. *See* LTV Steel Objection, pp. 38–39. DOE allegations are routinely asserted in lawsuits where discovery will establish which persons' conduct should be considered actionable. *Richard v. City of Harahan,* 6 F.Supp.2d 565, 575 (E.D.La. 1998); *Scheetz v. The Morning Call, Inc.,* 130 F.R.D. 34, 36–37 (E.D.Pa.1990) (stating that "Doe defendants are routinely used as stand-ins for real parties until discovery permits the intended defendants to be installed," and citing numerous cases).

The complaint intentionally identifies only those persons whom the Administrative Committee has found acted or failed to act in derogation of their duties. Naming persons as defendants in an action of this nature is a matter to be handled cautiously, particularly when the proposed lawsuit is procedurally proper. The objectants, who are alleged "fiduciaries," seek to penalize the ACC for not naming every director and officer as a defendant. The ACC chose, rather, to see if discovery will identify other persons who acted improp-

erly, and then to name them. This is an appropriate use of "DOE" designations.

### OBJECTION OF GLENN MORAN

Moran claims that the ACC's claims are not colorable for the following reasons:

(1) the Committee's complaint is based upon post-petition conduct that was approved by the Court and/or could have been attacked by any creditor in these transparent bankruptcy proceedings in which the Debtor and the creditors had all retained highly regarded financial and legal professionals to advise them.

(2) As a director and officer, may not be sued for negligence under either New Jersey or Delaware law (proposed counts I, VI, IX, XIII, XX, and XXII).

(3) There are no allegations sufficient to support a breach of duty of loyalty claim against him since he never seized any corporate opportunity or engaged in self-dealing (proposed counts VI and VII).

(4) There are no allegations to support a claim of gross negligence, reckless action or bad faith against him;

(5) No court has ever recognized a claim for deepening insolvency based upon actions occurring after the commencement of a bankruptcy and in the pre-petition cases recognizing deepening insolvency as a cause of action, the claim was based upon fraud (Counts XVII, XVIII, XXI, and XXIV);

(6) Claims for negligent misrepresentation (proposed Count XIII) and breach of fiduciary duty to the creditors of LTV Steel (proposed Count XXIV) are disguised individual creditor claims which cannot be filed in a derivative suit on behalf of the Debtor since it a benefit to the estate to receive goods and services without payment in full; and

(7) He did not have responsibility for the alleged financial mismanagement or improper supervision of the debtor's procurement; accounting and financial departments (proposed Counts IV, VII, and IX).

Moran also objects on the basis that the ACC has failed to plead any claim against Moran with particularity. Moran contends that the paragraphs mentioning him do not individually or collectively state any colorable claim. As previously ruled, the aforementioned objections are without merit. Each claim, as presented pertaining to Moran is a colorable claim under the *Gibson* test.

### OBJECTION OF JAMES A. BANSALL

█ James J. Bansall, Jr., Managing Director of Alixpartners, LLC joined in Objection of Glenn J. Moran and stated that Judge Bodoh's issued a ruling that he, as CRO, was not an actual corporate officer of LTV and accordingly, this ruling is the law of the case to preclude him being name as a defendant. This Court agrees with Bansall that he may not be included as a defendant in the proposed complaint based on a prior specific finding by this Court that he was not a corporate officer of LTV. *See* Judge Bodoh's ruling providing:

- Mr. Bonsall's authority within the corporate hierarchy will be limited.

- He will have no authority to commit LTV to any significant monetary obligation.

- He will have no independent authority to hire, to fire or to discipline LTV employees.

- It further appears that he will have none of the emoluments of office traditionally associated with being an actual corporate officer.

*See* Order dated March 30, 2001 (Dkt. No. 795–1). This objection is well-premised and is hereby sustained. No colorable

claim can therefore exist under the *Gibson* standard.

### POSTPETITION CONDUCT

 The Debtors and Moran both oppose the relief sought by the ACC on the grounds that the ACC's allegation include post-petition causes of actions. Both allege that the ACC may not seek such relief. Their objections, however, are without legal merit. Case law supports the ACC's pursuit of postpetition causes of action, as well as prepetition causes of action. *See Gray v. Executive Risk Indemnity, Inc. (In re Molten Metal Tech., Inc.),* 271 B.R. 711, 731–32 (Bankr.D.Mass. 2002); *O'Connell v. Pincus (In re Our Dist. Co., Inc.),* 110 B.R. 658, 660–61 (Bankr.S.D.N.Y.1990).

Courts have consistently held that postpetition causes of action concern the administration of the estate or arise in a bankruptcy case. *Hughes–Bechtol, Inc. v. Construction Mgm't, Inc. (In re Hughes–Bechtol, Inc.),* 132 B.R. 339, 346–47 (Bankr.S.D.Ohio 1991). As noted by the ACC, two recent bankruptcy opinions have not prohibited committees from pursuing postpetition conduct. *See G–I Holdings, Inc. v. Those Parties Listed on Exhibit A (In re G–I Holdings, Inc.),* 313 B.R. 612, 649–53 (Bankr.D.N.J.2004). Thus, the limited objection of the Debtors and Glenn Moran on this basis is without merit.

### DAMAGES

 Applicable case law provides that the ACC is not required to plead damages with particularity in contrast to the limited objection of the Debtors. Rule 8(a) of the Federal Rules of Civil Procedure requires only a short and plain statement of the claim showing that the pleader is entitled to relief. *See e.g. In re Tower Air, Inc.,* 416 F.3d 229 (3d Cir.2005); *Folkman v. Roster Financial LLC,* 2005 WL 2000169, *3 (D.N.J.,2005)(Rule 8(a) merely requires

"a short and plain statement of the claim," that suffices to "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests," In practice, this means that a plaintiff need plead only "basic facts," and "[i]f more facts are necessary to resolve or clarify the disputed issues, the parties may avail themselves of the civil discovery mechanisms under the Federal Rules."); *Gutshall v. Carlisle Local School Dist. Bd. Of Ed.,* 751 F.2d 385 (6th Cir.1984). Once the proposed complaint is filed, then the Court will set a discovery deadline which conceivably will provide a basis for a damages claim. See also allowing damages to be amended to comport with the evidence.

The ACC represents the constituency that stands to gain or lose on the Court's decision whether to grant the relief it seeks and on any outcome of litigation.

### GIBSON PRONG # 4 (Analysis applicable to all counts).

 Under Gibson, the creditor's committee's grounds for contending that the debtor-in-possession's inactivity on the claim is unjustifiable or abusive of their discretion must be established. It is undisputed that the ACC made an appropriate demand upon LTV Steel and LTV Corporation directors and officers to bring the proposed complaint. It is unrealistic to believe that the directors and officers who are named defendants would acquiesce to bringing a lawsuit upon themselves. *See e.g. Official Comm. of Unsec. Creds. of Cybergenics Corp. v. Chinery,* 330 F.3d 548, 573 (3d Cir.2003)(observing that "given management's sometimes severe conflicts of interests, a court order to file an action would frequently amount to instructing management to sue itself. To put it mildly, that is unlikely to result in vigorous prosecution of its claim"). Prong # 4 is therefore satisfied upon an appro-

priate demand made upon interested directors and officers of a corporation.

As the ACC points out, it is enlightening that no estate creditors have filed objections to the ACC's proposed complaint. Several have filed motions of support. *See Response of Liquidity Solutions, Inc.* (D.I. 8832) and *Response of Hunter Corporation* (D.I.8845).

## CONCLUSION

The pleadings and exhibits filed by the ACC reflect that it has met its burden generally that colorable claims exist to allow the filing of the proposed complaint to the extent addressed herein. *See Louisiana World Exposition v. Federal Ins. Co.,* 858 F.2d 233 at 248(an evidentiary need not be held as the Court can adequately assess the merits of a proposed lawsuit merely by considering the facts presented by the party seeking authority to commence and prosecute a lawsuit on behalf of a debtor-in-possession).

It is undisputed that the ACC has had over two years to compile the evidence and supporting documentation and presented the same to the Debtors for their review. More than a reasonable time has been afforded. After the filing of any complaint, a discovery period will allow for further examination of evidence by the parties.

It is further undisputed that the ACC made an appropriate demand upon the Debtors to bring the subject action on its own behalf. The Debtors refused the demand. The proposed complaint and attached exhibits reflect that the ACC has asserted claims for relief that on appropriate proof would allow a recovery for the benefit of the Debtors' estate. The proposed complaint contains allegations of breach of fiduciary duties owed to LTV; inadequate supervision and management of internal accounting; waste of corporate assets; and deepening insolvency among others. It is premature at this juncture to weigh the evidence prior to the filing of the proposed complaint. The Court does not find that the proposed allegations lack any merit whatsoever and that appropriate trial upon the merits is warranted, in view of the standards enunciated in the *Gibson* opinion.

The Court hereby vacates its oral ruling dismissing Counts XI through XIV based on the foregoing analysis.

Accordingly, the ACC's motion to prosecute the subject proposed complaint is hereby granted, in part, as determined herein. The objections/limited objections of LTV Steel and Glenn Moran are hereby sustained, in part and overruled in part, as determined herein. The objection of James Bansall is hereby sustained. To the extent that this Court's oral bench ruling of August 9, 2005 may vary from the relief ordered herein, this written opinion controls. Each party is to bear its respective costs.

IT IS SO ORDERED.

## *JUDGMENT*

At Cleveland, in said District, on this *2nd* day of September, 2005.

A Memorandum Of Opinion And Order having been rendered by the Court in this matter,

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the Administrative Claimants Committee's (ACC) motion to prosecute the subject proposed complaint is hereby granted, in part, as determined herein. The objections/limited objections of LTV Steel and Glenn Moran are hereby sustained, in part and overruled, in part, as determined herein. The objection of James Bansall is hereby sustained. To the extent that this Court's

oral bench ruling of August 9, 2005 may vary from the relief ordered herein, this written opinion controls. Each party is to bear its respective costs.

IT IS SO ORDERED.